ORIGINAL 067528

FILED
JAN 2 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KENNEY ORTHOPEDIC, LLC, )
Plaintiff )
)
v. ) No. 08- 3 C
)
THE UNITED STATES )
Defendants )
)

## COMPLAINT

Plaintiffs, Kenney Orthopedic, LLC, for its Complaint against the Defendant, the United States, states as follows:

## NATURE OF THE ACTION

1. Kenney Orthopedic, LLC is a government contractor providing prosthetic and orthotic devices and services to the United States Government and to its veterans.

2. This Court has jurisdiction pursuant to the Contract Disputes Act, 41 U.S.C. § 601, *et seq.* and the Tucker Act, 28 U.S.C. § 1491 *et seq.*

3. This action involves prosthetic and orthotic services provided to the United States Department of Veterans Affairs ("VA") by Kenney Orthopedic pursuant to Contract No.V249-P-0011 ((the "Contract"), dated August 15, 2006. A true and correct copy of the Contract is attached hereto as Exhibit A.

4. On December 19, 2006, the VA, erroneously provided notice to Kenney that Kenney was "not complying with the terms and conditions of the contract," and demanded that Kenney provide a plan "which will specify ... actions for correcting these deficiencies immediately." Exhibit "B."

5. On December 21, 2006, the VA requested an amendment to the Contract. Exhibit "C."

6. On December 22, 2006, counsel for Kenney Orthopedic responded to the VA's notice by asking for further information and documentation in support of the

allegations and advising the VA that it was" unable to locate any instances where it has not been in compliance with the terms and conditions of the contract for Standards of Performance." Exhibit "D."

7. By letter dated January 8, 2007, the VA responded with certain specifics and stated that Kenney had provided a prosthesis prior to receipt of a prescription and had provided a patient with more socks than prescribed. The VA further demanded that Kenney Orthopedic provide a "plan for correcting these problems." Exhibit "E."

8. On January 22, 2007, counsel for Kenney Orthopedic responded to the allegations with a detailed explanation of the events and provided a detailed time-line that refuted the position asserted by the VA by explaining that the fittings had taken place but that no prosthesis had been delivered until after the prescription had been received.. In addition, Kenney Orthopedic acknowledged that it had provided the usual and customary number of socks (12) rather than the number actually prescribed (6). Kenney assured the VA that he would not seek compensation for these additional socks and had already "undertaken to assure that the number of socks requested in the future are verified prior seeking payment for same." Exhibit "F."

9. On February 27, 2007, the VA sent another letter to Kenney Orthopedic, this time refusing payment for a prosthetic socket and accusing Kenney of "negligence in providing an appropriately fitting prosthesis ... on November 3, 2006" and accusing Kenney of "alter[ing] prescriptions without having prior approval and written authority." Exhibit "G."

10. On February 28, the VA forwarded to Kenney Orthopedic a modification of the Prescription Policy for Prosthesis. "Exhibit "H."

11. On March 9, 2007, counsel for Kenney Orthopedic conferred by telephone with Betty Benmark of the VA, regarding the lack of any response to his January 22, 2007 letter, and expressing concern over the allegations of negligence in the VA's February 27, 2007 letter – specifically since the VA had mis-stated the procedure by claiming that it was for a replacement "prosthesis" when the actual prescription was merely for a replacement socket.

12. The contents of this conversation were reiterated in a letter from counsel for Kenney Orthopedic to the VA dated March 13, 2007. Exhibit "I."

13. On the following day, March 14, 2007, counsel for Kenney Orthopedic again communicated with Ms. Benmark at the VA because of concern over additional socket replacement requests and prosthesis prescriptions and the VA's refusal to make payment to Kenney Orthopedic. Exhibit "J"

14. On March 30, 2007, Ms. Benmark of the VA responded to the concerns raised in the letters of March 13 and March 14, 2007. Exhibit "K."

15. On April 19, 2007, the VA demanded that Kenney Orthopedic comply with the VA's unilateral amendment to the Contract (Exhibit C) regarding a consolidated Patient Satisfaction Survey report. Exhibit "L."

16. On April 19, 2007, Kenney Orthopedic responded by advising the VA that the Contract could not be modified without written agreement of both parties. Exhibit "M."

17. On April 23, 2007, counsel for Kenney Orthopedic responded to the VA's demand for the Patient Satisfaction Survey by requesting a copy of the signed amendment and advising that the terms of the Contract require both parties to agree to modification. Exhibit "N."

18. On April 23, 2007, counsel for Kenney Orthopedic responded to the contents of the letter from Ms. Benmark (Exhibit K), addressing each of the erroneous conclusions stated by Ms. Benmark. Exhibit "O."

19. On July 2, 2007, the VA provided notice to Kenney Orthopedic of its intent to extend the Contract. Exhibit "P."

20. On July 18, 2007, counsel for Kenney Orthopedic again communicated with Ms. Benmark at the VA and demanded that the VA retract its statements about negligence by Kenney Orthopedic since the nothing in the documentation supported the allegation and the VA's version of events was contradicted by a sworn statement provided by the subject patient. Exhibit "Q."

21. On August 29, 2007, the VA responded by stating that "the Government considers your failure to comply with the ordering requirement required in your contract a condition that is endangering performance of the contract." In addition, the VA warned Kenney Orthopedic that failure to cure the condition within 10 days could result in termination for default. The VA further accused Kenney Orthopedic of "blatant and willful violation of the contract terms" and failing to obtain a purchase order – although no specifics of the alleged violation were provided. The VA also accused Kenney Orthopedic of "plac[ing] our veterans at high risk." Exhibit "R."

22. On September 17, 2007, counsel for Kenney Orthopedic again responded to the allegations and accusations, expressing grave concern over the defamatory statements being made by the VA about Kenney Orthopedic and demanding that an independent

party, knowledgeable in prosthetic procedures, review the actions taken because it had become evident that the VA personnel handling this matter did not have an understanding of the fine distinctions in terminology and methodology. Exhibit "S."

23. Notwithstanding the multiple previous letters, and specifically the letter of September 17, 2007, the VA advised Kenney Orthopedic on September 18,2007, that Kenney had "failed to respond to my request for a signed statement attesting to your commitment to comply with the terms and conditions of the contract." Exhibit "T."

24. On September 24, 2007, counsel for Kenney Orthopedic again responded to the VA's allegations with a demand that this matter be reviewed by an independent party because the allegations were baseless and defamatory. Exhibit "U."

25. On October 4, 2007, counsel for Kenney Orthopedic communicated with the VA regarding the growing concerns over the VA's improper efforts to interfere with the proper course of treatment of VA patients. Exhibit "V."

26. On October 23, 2007, despite the litany of correspondence referenced above, including specifically the letters dated September 17 and September 24, 2007. the Contracting Officer of the VA improperly terminated Contract No. VA249-P-0011,"for cause in its entirety" and incorrectly stated that "Kenney Orthopedic, LLC has not responded to the cure notice issued on September 18, 2007." Exhibit "W."

27. On November 3, 2007, counsel for Kenney Orthopedic attempted to resolve this matter without need for litigation by pointing out to the VA that Kenney Orthopedic had, in fact, responded on multiple occasions. That letter has been ignored. Exhibit "X."

**COUNT I: <u>Breach of Contract</u>**

28. Kenney Orthopedic incorporates by reference the allegations contained in paragraphs 1 through 27 above as fully as if said allegations were set forth herein verbatim.

29. Kenney Orthopedic entered into a contractual relationship with the VA under the Contract attached hereto as Exhibit A.

30. Kenney Orthopedic has fulfilled all of its contractual obligations and has provided prosthetic services to the VA-administered medical centers, as contracted.

31. Under plain language of the Contract, Kenney Orthopedic is entitled to bill VA according to the services provided and for damages resulting from the VA's improper breach of the Contract.

32. VA has breached its contractual obligation by rejecting Kenney Orthopedic's bills calculated according to the Contract for services rendered.

33. VA has impermissibly required the adherence to an amendment to the Contract that it unilaterally imposed without consent and in contravention of the express terms of Part II-Contract Terms and Conditions, Section C of the Contract.

34. Accordingly, Kenney Orthopedic is entitled to additional compensation, plus interest.

35. All conditions precedent to the relief sought in this count of the Complaint have occurred, have been met, or have been waived.

**COUNT II: <u>Tortious Interference with a Prospective Advantage</u>**

36. Kenney Orthopedic incorporates by reference the allegations contained in paragraphs 1 through 35 above as fully as if said allegations were set forth herein verbatim.

37. As a direct result of the VA's actions herein, Kenney Orthopedic' business efforts have been damaged by and through the VA's interference with Plaintiff's ability to obtain future contracts until such time as the VA's false allegations and intentional interference with Plaintiff's ability to perform under the terms and conditions of the underlying contract are resolved.

38. As a result of Plaintiff's inability to secure contracts and conduct regular business with VA patients, as well as the interference with additional patients and potential patients by and through the blatantly false allegations regarding Plaintiff, Plaintiff has incurred substantial damages, lost business, damage to reputation, good will, and value of the going business.

39. As a result of Plaintiff's numerous inquiries to the VA regarding the concerns regarding the false allegations regarding Plaintiff and its ongoing care of VA patients, and the VA's efforts to utilize its leverage to damage Plaintiff's business ventures, the VA knew or had reason to know that Plaintiff would be damaged if the VA pursued the inappropriate actions that have been taken by the VA herein.

40. The VA's conduct, as set forth above, constitutes tortious interference with the Plaintiff's prospective and contractual advantages with prospective, current, and prior patients.

41. As a proximate result of Defendant's actions, Plaintiff has suffered and will

continue to suffer substantial financial harm that it would not otherwise have suffered absent the VA's malicious conduct.

42. As a result of Defendant's tortious interference, Plaintiff is entitled to recover all damages sustained as a result, including actual, compensatory, and punitive damages in an amount in excess of the minimum amount necessary for this Court to have jurisdiction of the within action, plus all Court costs and reasonable attorneys' fees incurred herein.

**COUNT III: <u>Tortious Interference with a Contractual Advantage</u>**

43. Kenney Orthopedic incorporates by reference the allegations contained in paragraphs 1 through 42 above as fully as if said allegations were set forth herein verbatim.

44. Kenney Orthopedic had a valid business relationship with its former patients that arose directly from the VA Contract.

45. The Defendant had full knowledge of Kenney Orthopedic' business relationships with these former patients as a direct result of the VA Contract.

46. The Defendant knowingly and intentionally made false statements about Kenney Orthopedic in a concerted effort to interfere with Kenney Orthopedic' business relationships with the improper motive of damaging or destroying Kenney Orthopedic' contractual relations with those former patients.

47. As a proximate result of Defendant's actions, Kenney Orthopedic has suffered and will continue to suffer substantial financial harm that it would not otherwise have suffered absent Defendant's intentional interference with Kenney Orthopedic' contractual relations.

48. As a result of Defendant's actions, Kenney Orthopedic is entitled to recover all damages sustained as a result, including actual, compensatory, and punitive damages.

**COUNT IV: <u>Intentional Infliction of Emotional Distress</u>**

49. Kenney Orthopedic incorporates by reference the allegations contained in paragraphs 1 through 48 above as fully as if said allegations were set forth herein verbatim.

50. By making false statements to Kenney's former customers and referral sources, Defendant intentionally and maliciously published false information designed to

cause the owner of Kenney Orthopedic, John M. Kenney, substantial harm.

51. Defendant knew, or should have known, that the false, malicious statements published about John M. Kenney and Kenney Orthopedic would cause extreme emotional distress.

52. As a proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer substantial financial harm that they would not otherwise have suffered absent Defendant's improper actions.

53. As a result of Defendant's malicious and false publications, Plaintiff is entitled to recover all damages sustained as a result, including actual, compensatory, and punitive damages.

**WHEREFORE**, Kenney Orthopedic demands judgment in its favor and against the Defendant as follows:

(a) That Kenney Orthopedic be awarded damages for VA's breach of contract in an amount to be determined upon the trial of this matter, but in no event less than $500,000 plus interest, costs, attorneys' fees, and other related damages;

(b) Judgment against the above-named Defendant for actual damages, with interest thereon;

(c) Judgment against the above-named Defendant for general, compensatory and punitive damages as applicable;

(d) That Plaintiff be awarded fees and costs;

(e) That this Court grant such other and further relief to Plaintiff as is just and proper.

MORRIS & MORRIS, P.S.C.

By: ______________________________
James M. Morris
217 North Upper Street
P. O. Box 394
Lexington, Kentucky 40588-0394
Telephone: (859) 281-6981
Facsimile: (859) 233-7876
ATTORNEYS FOR PLAINTIFFS

M:\EMPLOY\KENNEY\Complaint.VA.wpd

PART I -- CONTINUATION OF STANDARD FORM 1449 (SF 1449)

SUPPLIES OR SERVICES AND PRICES/COSTS

## Description of Supplies and Services.

The Department of Veteran Affairs, Lexington, KY Medical Center has an ongoing program to furnish artificial limbs and related services to those veterans that require them and are eligible for assistance. It is VA's intention to solicit proposals and award multiple contracts on a competitive basis under the authority of Title 38 U.S.C. Section 8123. Contract period is August 20, 2006 through August 19, 2007 with two renewable option years.

## PRICING SCHEDULE

For fabrication and repair of artificial limbs, the prices proposed shall not exceed the established L-Code prices applicable to the geographic area subject to this solicitation and at the time of performance. It should be noted that repair rates for 15 minute increments are now part of the L-Code pricing schedule. Considering this, please apply the best percentage discount that you offer against the L-Code pricing baseline. Offeror's are to give a discount on all L-Codes (limbs, labor rates for repairs and components).

Offeror's pricing is hereby offered for beneficiaries serviced by the VA Medical Center, Lexington, KY.

| | |
|---|---|
| BASE YEAR | L-CODE PRICING LESS 10 % DISCOUNT |
| OPTION YEAR 1 | L-CODE PRICING LESS 10 % DISCOUNT |
| OPTION YEAR 2 | L-CODE PRICING LESS 10 % DISCOUNT |

*** It should be noted that L-Code pricing are published by HCFA's Common Procedure Coding System (HCPCS). The website for the L-Code Pricing: http://cms.hhs.gov/providers/pufdownload/#dme (DME, Orthotics and Prosthetics). The L-Codes are updated every year and are released in December, for the following year.**

END PRICING SCHEDULE

PLAINTIFF'S EXHIBIT A

## CONTRACT ADMINISTRATION DATA

The contracting officer is the only person authorized to approve changes or modify any of the requirements under this contract. The Contractor shall communicate with the Contracting Officer on all matters pertaining to contract administration. Only the Contracting Officer is authorized to make commitments or issue changes, which will affect price, quantity, or quality of performance of this contract. In the event the contractor effects any such change at the direction of any person other than the contracting officer, the change shall be considered to have been made without authority and no adjustment will be made in the contract price to cover any increase in costs incurred as a result thereof.

1. Contract administration matters will be handled by:

   a. CONTRACTOR'S NAME/ADDRESS/CITY/STATE-ZIP (Please print or type):

   Kenney Orthopedics
   449 Lewis Hargett Circle
   St 110, Lexington, Ky 40503

   Point of Contact/Title: Paul Katzman, Business Office MgR

   Telephone: 859-373-0208

   Facsimile #: 859-373-0939

   E-mail: PRKatzman@kenneyorthopedics.com

   b. GOVERNMENT: Yvette Blackston
   Contracting Officer (90C)
   Tennessee Valley Healthcare System
   3400 Lebanon Pike
   Murfreesboro, TN 37129
   Tel: 615-867-5957
   Fax: 615-867-5429

2. CONTRACTOR'S REMITTANCE ADDRESS: All payment by the Government to the contractor will be made in accordance with Federal Acquisition Regulation (FAR) Clause 52.232-34, Payment by Electronic Funds Transfer—Other than Central Contractor Registration (31 U.S.C. 3332):

   ADDRESS: ____________________
   ____________________
   ____________________
   ____________________

OFFERORS MUST COMPLETE AND RETURN ALL INFORMATION DESIGNATED IN 52.212-1, INSTRUCTIONS TO OFFERORS - COMMERCIAL ITEMS, PARAGRAPH "b", AND COMPLETE 52.212-3, OFFEROR REPRESENTATIONS AND CERTIFICATIONS - COMMERCIAL ITEMS PRIOR TO THE TIME SPECIFIED IN BLOCK 8 OF SF 1449 IN ORDER TO BE CONSIDERED FOR AWARD.

Sealed offers for furnishing the supplies or services in the Schedule will be received at the address specified in Block 9 of SF 1449, or if handcarried, to the address shown in Block 15, until the date and time specified in Block 8. CAUTION - LATE Submissions, Modifications, and Withdrawals: See provision 52.212-1. All offers are subject to all terms and conditions of this solicitation.

HHS/OIG: To ensure that the individuals providing services under the contract have not engaged in fraud or abuse regarding Sections 1128 and 1128A of the Social Security Act regarding federal health care programs, the contractor is required to check the Health and Human Services - Office of Inspector General (HHS/OIG), List of Excluded Individuals/Entities on the OIG Website (www.hhs.gov/oig) for each person providing services under this contract. Further the Contractor is required to certify in its proposal that all persons listed in the contractor's proposal have been compared against the OIG list and are NOT listed. During the performance of this contract the Contractor is prohibited from using any individual or business listed on the List of Excluded Individuals/Entities.

**DUNS NUMBER:** Please provide the Dun and Bradstreet Number assigned to your firm in the space provided below:

DUNS# 1 1 2 0 3 5 1 5 4

**Respondents shall indicate their Federal Taxpayer Identification Number (TIN):** 611400251

**ACKNOWLEDGMENT OF AMENDMENTS:** The offeror acknowledges receipt of amendments to the Solicitation numbered and dated as follows:

| AMENDMENT NUMBER | DATE |
|---|---|
| | |
| | |
| | |

The Government may award multiple contract(s) under this Indefinite Delivery Indefinite quantity (IDIQ) solicitation per page 6 on the basis of initial offers received, without discussions. Therefore, each initial offer should contain the offeror's best terms from a cost/price and technical standpoint. The Government will award multiple aggregate contract(s) contingent upon best value and the offeror's ability to meet all requirements.

HIPAA COMPLIANCE: HIPAA compliance is required. Business Associate Agreement under Public Law 104-191, Health Insurance Portability and Accountability Act (HIPAA) of 1996 and the National Standards to Protect the Privacy and Security of Protected Health Information (PHI) does NOT apply to this solicitation.

**ABBREVIATIONS:**

| | |
|---|---|
| L-CODE | MEDICARE CODE FOR ARTIFICIAL LIMBS |
| ABC | AMERICAN BOARD FOR CERTIFICATION IN ORTHOTICS AND PROSTHETICS |
| BOC | BOARD FOR ORTHOTIST-PROSTHETIST CERTIFICATION (ACCREDITED FACILITIES PROGRAM) |
| VAQP | VA QUALIFIED PROSTHETIST (FABRICATION ARTIFICIAL LIMBS) |
| CAD/CAM | COMPUTER AIDED DESIGN/COMPUTER AIDED MANUFACTURER |
| NSNA | NATURAL SHAPE NATURAL ALIGNMENT |
| NAAOP | NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF ORTHOTICS AND PROSTHETICS |
| AAOP | AMERICAN ACADEMY OF ORTHOTICS AND PROSTHETICS |
| AOPA | AMERICAN ORTHOTIC AND PROSTHETIC ASSOCIATION |
| IAOP | INTERNATIONAL ASSOCIATION OF ORTHOTICS AND PROSTHETICS (), |

52.212-2 EVALUATION--COMMERCIAL ITEMS (JAN 1999)

TECHNICAL EVALUATION AND PRICE PROPOSAL:

In order to be responsive to this solicitation, the Contractor must fill out all applicable spaces and certifications. In addition, the Contractor must submit a Technical Proposal with detailed data addressing all evaluation factors to be considered for award. The Technical Proposal must provide sufficient information to demonstrate the contractor's capabilities to satisfactorily perform the work detailed in Supplies or Services and Prices/Costs section. The Government reserves the right to accept or reject an offer based on the contractor's qualifications and responses to Evaluation Criteria.

**Contractor's Technical Proposal must address the following evaluation criteria:**

**Education of Individuals Providing Supplies and Services to VA Beneficiaries** – Provide information that includes all collegiate or advance degrees obtained, training courses completed, and the dates of completion of each, and all certifications, licenses, or other professional recognition obtained. Participates in continuing education credits and pays dues to the appropriate certifying Agency (ABC, BOC, VAQP - VA qualified or State Licensing) and to be in good standing.

**Quality of Offerors Facility** – Provide information that includes a description of the facility to be utilized, including its assembling and servicing capabilities, any certifications, permits, licenses, or other documents issued from applicable authorities, or as are required by law, and a VA Form 10-2793, Shop Data Sheet (Artificial limbs) that has been completed within the past 3 years.

**Management Capabilities and Approach** -Describe management methods to assure the provision of prompt and quality service, including a description of a quality assurance and customer service plan tailored towards the unique client base of the Department of Veterans Affairs. Has a HIPAA plan in effect to insure patient privacy and rights.

**The ability of the Contractor/Contractor Employees to meet JCAHO or other Regulatory Body Requirements** - Provide information of the ability to perform the required work in accordance with JCAHO standards. A copy of the Job Description; a current, completed Competence Assessment Checklist; a current performance evaluation, and listing of relevant continuing education for the last two years for each Contractor employee who is proposed to provide services under a contract resulting from this solicitation.

**Past Performance** - The quote shall demonstrate past performance by identifying a minimum of three references with similar size and complexity. References shall at a minimum include name of organization, point of contact, and point of contact phone number.

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. Proposals received in response to this Solicitation will be evaluated against the following criteria. The technical criteria are equal in weight. Technical, past performance are equal to each other and when combined are equal to Price. Offerors are reminded that all offers must demonstrate that Offerors meet the minimum requirements set forth under General Requirements of the solicitation, and that award will be made to no more than those specified in the Type of Contract paragraph. The following factors shall be used to evaluate offers:

**The following items identified in this section detail the minimum requirements of the Government in descending order of importance.**

(1) Price
(2) Technical Evaluation Criteria
  (i) Education of Individuals Providing Supplies and Services to VA Beneficiaries;
  (ii) Quality of Offeror's Facility;
  (iii) Management Capabilities and Approach;
  (iv) The ability of the Contractor/Contractor Employees to meet Regulatory Body Requirements.
(3) Past Performance

(b) Options. The Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced. Evaluation of options shall not obligate the Government to exercise the option(s).

(c) A written notice of award or acceptance of an offer, mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer, shall result in a binding contract without further action by either party. Before the offer's specified expiration time, the Government may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award.

(End of Provision)

52.212-3 OFFEROR REPRESENTATIONS AND CERTIFICATIONS--COMMERCIAL ITEMS (JUNE 2006)

An offeror shall complete only paragraph (j) of this provision if the offeror has completed the annual representations and certifications electronically at http://orca.bpn.gov. If an offeror has not completed the annual representations and certifications electronically at the ORCA website, the offeror shall complete only paragraphs (b) through (i) of this provision.

(a) Definitions. As used in this provision:

Emerging small business means a small business concern whose size is no greater than 50 percent of the numerical size standard for the NAICS code designated.

Forced or indentured child labor means all work or service--

(1) Exacted from any person under the age of 18 under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily; or

(2) Performed by any person under the age of 18 pursuant to a contract the enforcement of which can be accomplished by process or penalties.

Service-disabled veteran-owned small business concern--

(1) Means a small business concern--

(i) Not less than 51 percent of which is owned by one or more service--disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; and

(ii) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran.

(2) Service-disabled veteran means a veteran, as defined in 38 U.S.C. 101(2), with a disability that is service-connected, as defined in 38 U.S.C. 101(16).

Small business concern means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR part 121 and size standards in this solicitation.

Veteran-owned small business concern means a small business concern--

(1) Not less than 51 percent of which is owned by one or more veterans (as defined at 38 U.S.C. 101(2)) or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and

(2) The management and daily business operations of which are controlled by one or more veterans.

Women-owned small business concern means a small business concern--

(1) Which is at least 51 percent owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

Women-owned business concern means a concern which is at least 51 percent owned by one or more women; or in the case of any publicly owned business, at least 51 percent of its stock is owned by one or more women;and whose management and daily business operations are controlled by one or more women.

(b) Taxpayer Identification Number (TIN) (26 U.S.C. 6109, 31 U.S.C. 7701). (Not applicable if the offeror is required to provide this information to a central contractor registration database to be eligible for award.)

(1) All offerors must submit the information required in paragraphs (b)(3) through (b)(5) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the Internal Revenue Service (IRS).

(2) The TIN may be used by the Government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government (31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the offeror's TIN.

(3) Taxpayer Identification Number (TIN).

[ ] TIN: ____________________.

[ ] TIN has been applied for.

[X] TIN is not required because:

[ ] Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the United States and does not have an office or place of business or a fiscal paying agent in the United States;

[ ] Offeror is an agency or instrumentality of a foreign government;

[ ] Offeror is an agency or instrumentality of the Federal Government.

(4) Type of organization.

[ ] Sole proprietorship;

[ ] Partnership;

[X] Corporate entity (not tax-exempt);

[ ] Corporate entity (tax-exempt);

[ ] Government entity (Federal, State, or local);

[ ] Foreign government;

[ ] International organization per 26 CFR 1.6049-4;

[ ] Other ___________________.

(5) Common parent.

[X] Offeror is not owned or controlled by a common parent;

[ ] Name and TIN of common parent:

Name ___________________.

TIN ___________________.

(c) Offerors must complete the following representations when the resulting contract will be performed in the United States or its outlying areas. Check all that apply.

(1) Small business concern. The offeror represents as part of its offer that it [ ] is, [X] is not a small business concern.

(2) Veteran-owned small business concern. [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents as part of its offer that it [ ] is, [X] is not a veteran-owned small business concern.

(3) Service-disabled veteran-owned small business concern. [Complete only if the offeror represented itself as a veteran-owned small business concern in paragraph (c)(2) of this provision.] The offeror represents as part of its offer that it [ ] is, [X] is not a service-disabled veteran-owned small business concern.

(4) Small disadvantaged business concern. [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents, for general statistical purposes, that it [ ] is, [X] is not a small disadvantaged business concern as defined in 13 CFR 124.1002.

(5) Women-owned small business concern. [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents that it [ ] is, [X] is not a women-owned small business concern.

Note: Complete paragraphs (c)(6) and (c)(7) only if this solicitation is expected to exceed the simplified acquisition threshold.

(6) Women-owned business concern (other than small business concern). [Complete only if the offeror is a women-owned business concern and did not represent itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents that it [ ] is a women-owned business concern.

(7) Tie bid priority for labor surplus area concerns. If this is an invitation for bid, small business offerors may identify the labor surplus areas in which costs to be incurred on account of manufacturing or production (by offeror or first-tier subcontractors) amount to more than 50 percent of the contract price:

_______N/A_______________________

(8) Small Business Size for the Small Business Competitiveness Demonstration Program and for the Targeted Industry Categories under the Small Business Competitiveness Demonstration Program. [Complete only if the offeror has represented itself to be a small business concern under the size standards for this solicitation.]

(i) [Complete only for solicitations indicated in an addendum as being set-aside for emerging small businesses in one of the designated industry groups (DIGs).] The offeror represents as part of its offer that it [ ] is, [X] is not an emerging small business.

(ii) [Complete only for solicitations indicated in an addendum as being for one of the targeted industry categories (TICs) or designated industry groups (DIGs).] Offeror represents as follows:

(A) Offeror's number of employees for the past 12 months (check the Employees column if size standard stated in the solicitation is expressed in terms of number of employees); or

(B) Offeror's average annual gross revenue for the last 3 fiscal years (check the Average Annual Gross Number of Revenues column if size standard stated in the solicitation is expressed in terms of annual receipts).

(Check one of the following):

| Number of Employees | Average Annual Gross Revenues |
|---|---|
| X 50 or fewer | __ $1 million or less |
| __ 51--100 | X $1,000,001--$2 million |
| __ 101--250 | __ $2,000,001--$3.5 million |
| __ 251--500 | __ $3,500,001--$5 million |
| __ 501--750 | __ $5,000,001--$10 million |
| __ 751--1,000 | __ $10,000,001--$17 million |
| __ Over 1,000 | __ Over $17 million |

(9) [Complete only if the solicitation contains the clause at FAR 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns, or FAR 52.219-25, Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting, and the offeror desires a benefit based on its disadvantaged status.]

(i) General. The offeror represents that either--

(A) It [ ] is, [X] is not certified by the Small Business Administration as a small disadvantaged business concern and identified ,on the date of this representation, as a certified small disadvantaged business concern in the database maintained by the Small Business Administration (PRO-Net), and that no material change in disadvantaged ownership and control has occurred since its certification, and, where the concern is owned by one or more individuals claiming disadvantaged status, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); or

(B) It [ ] has, [X] has not submitted a completed application to the Small Business Administration or a Private Certifier to be certified as a small disadvantaged business concern in accordance with 13 CFR 124, Subpart B, and a decision on that application is pending, and that no material change in disadvantaged ownership and control has occurred since its application was submitted.

(ii) [ ] Joint Ventures under the Price Evaluation Adjustment for Small Disadvantaged Business Concerns. The offeror represents, as part of its offer, that it is a joint venture that complies with the requirements in 13 CFR 124.1002(f) and that the representation in paragraph (c)(9)(i) of this provision is accurate for the small disadvantaged business concern that is participating in the joint venture. [The offeror shall enter the name of the small disadvantaged business concern that is participating in the joint venture: ______________.]

(10) HUBZone small business concern. [Complete only if the offeror represented itself as a small business concern in paragraph (c)(1) of this provision.] The offeror represents, as part of its offer, that--

(i) It [ ] is, [X] is not a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material change in ownership and control, principal office, or HUBZone employee percentage has occurred since it was certified by the Small Business Administration in accordance with 13 CFR part 126; and

(ii) It [ ] is, [X] is not a joint venture that complies with the requirements of 13 CFR part 126, and the representation in paragraph (c)(10)(i) of this provision is accurate for the HUBZone small business concern or concerns that are participating in the joint venture. [The offeror shall enter the name or names of the HUBZone small business concern or concerns that are participating in the joint venture:____________.] Each HUBZone small business concern participating in the joint venture shall submit a separate signed copy of the HUBZone representation.

(d) Representations required to implement provisions of Executive Order 11246--

(1) Previous contracts and compliance. The offeror represents that--

(i) It [ ] has, [X] has not participated in a previous contract or subcontract subject to the Equal Opportunity clause of this solicitation; and

(ii) It [ ] has, [X] has not filed all required compliance reports.

(2) Affirmative Action Compliance. The offeror represents that--

(i) It [ ] has developed and has on file, [X] has not developed and does not have on file, at each establishment, affirmative action programs required by rules and regulations of the Secretary of Labor (41 CFR parts 60-1 and 60-2), or

(ii) It [ ] has not previously had contracts subject to the written affirmative action programs requirement of the rules and regulations of the Secretary of Labor.

(e) Certification Regarding Payments to Influence Federal Transactions(31 U.S.C. 1352). (Applies only if the contract is expected to exceed $100,000.) By submission of its offer, the offeror certifies to the best of its knowledge and belief that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress or an employee of a Member of Congress on his or her behalf in connection with the award of any resultant contract.

(f) Buy American Act Certificate. (Applies only if the clause at Federal Acquisition Regulation (FAR) 52.225-1, Buy American Act--Supplies, is included in this solicitation.)

(1) The offeror certifies that each end product, except those listed in paragraph (f)(2) of this provision, is a domestic end product and that the offeror has considered components of unknown origin to have been mined, produced, or manufactured outside the United States. The offeror shall list as foreign end products those end products manufactured in the United States that do not qualify as domestic end products. The terms "component," "domestic end product," "end product," "foreign end product," and "United States" are defined in the clause of this solicitation entitled "Buy American Act--Supplies."

(2) Foreign End Products:

| Line Item No | Country of Origin |
| --- | --- |
| N/A | |
| | |
| | |

[List as necessary]

(3) The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25.

(g)(1) Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate. (Applies only if the clause at FAR 52.225-3, Buy American Act--Free Trade Agreements--Israeli Trade Act, is included in this solicitation.)

(i) The offeror certifies that each end product, except those listed in paragraph (g)(1)(ii) or (g)(1)(iii) of this provision, is a domestic end product and that the offeror has considered components of unknown origin to have been mined, produced, or manufactured outside the United States. The terms "component," "domestic end product," "end product," "foreign end product," and "United States" are defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act."

(ii) The offeror certifies that the following supplies are end products of Australia, Canada, Chile, Mexico, or Singapore, or Israeli end products as defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act":

END PRODUCTS OF AUSTRALIA, CANADA, CHILE, MEXICO, OR SINGAPORE OR ISRAELI END PRODUCTS:

| Line Item No | Country of Origin |
| --- | --- |
| N/A | |
| | |
| | |

[List as necessary]

(iii) The offeror shall list those supplies that are foreign end products (other than those listed in paragraph (g)(1)(ii) of this provision) as defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act." The offeror shall list as other foreign end products those end products manufactured in the United States that do not qualify as domestic end products.

Other Foreign End Products:

| Line Item No | Country of Origin |
| --- | --- |
| N/A | |
| | |
| | |

[List as necessary]

(iv) The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25.

(2) Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate, Alternate I (Jan 2004). If Alternate I to the clause at FAR 52.225-3 is included in this solicitation, substitute the following paragraph (g)(1)(ii) for paragraph (g)(1)(ii) of the basic provision:

(g)(1)(ii) The offeror certifies that the following supplies are Canadian end products as defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act":

Canadian End Products:

Line Item No.

N/A ______________________

______________________

______________________

(List as necessary)

(3) Buy American Act--Free Trade Agreements--Israeli Trade Act Certificate, Alternate II (Jan 2004). If Alternate II to the clause at FAR 52.225-3 is included in this solicitation, substitute the following paragraph (g)(1)(ii) for paragraph (g)(1)(ii) of the basic provision:

(g)(1)(ii) The offeror certifies that the following supplies are Canadian end products or Israeli end products as defined in the clause of this solicitation entitled "Buy American Act--Free Trade Agreements--Israeli Trade Act":

Canadian or Israeli End Products:

| Line Item No | Country of Origin |
| --- | --- |
| N/A | |
| | |
| | |

[List as necessary]

(4) Trade Agreements Certificate. (Applies only if the clause at FAR 52.225-5, Trade Agreements, is included in this solicitation.)

(i) The offeror certifies that each end product, except those listed in paragraph (g)(4)(ii) of this provision, is a U.S.-made, designated country end product, as defined in the clause of this solicitation entitled "Trade Agreements."

(ii) The offeror shall list as other end products those end products that are not U.S.-made or designated country, end products.

Other End Products:

| Line Item No | Country of Origin |
| --- | --- |
| N/A | |
| | |
| | |

[List as necessary]

(iii) The Government will evaluate offers in accordance with the policies and procedures of FAR Part 25. For line items covered by the WTO GPA, the Government will evaluate offers of U.S.-made or designated country end products without regard to the restrictions of the Buy American Act. The Government will consider for award only offers of U.S.-made or designated country end products unless the Contracting Officer determines that there are no offers for such products or that the offers for such products are insufficient to fulfill the requirements of the solicitation.

(h) Certification Regarding Debarment, Suspension or Ineligibility for Award (Executive Order 12549). (Applies only if the contract value is expected to exceed the simplified acquisition threshold.) The offeror certifies, to the best of its knowledge and belief, that the offeror and/or any of its principals--

(1) [ ] Are, [X] are not presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency; and

(2) [ ] Have, [X] have not, within a three-year period preceding this offer, been convicted of or had a civil judgment rendered against them for: Commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a Federal, state or local government contract or subcontract; Violation of Federal or state antitrust statutes relating to the submission of offers; or Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; and

(3) [ ] Are, [X] are not presently indicted for, or otherwise criminally or civilly charged by a Government entity with, commission of any of these offenses.

(i) Certification Regarding Knowledge of Child Labor for Listed End Products (Executive Order 13126). [The Contracting Officer must list in paragraph (i)(1) any end products being acquired under this solicitation that are included in the List of Products Requiring Contractor Certification as to Forced or Indentured Child Labor, unless excluded at 22.1503(b).]

(1) Listed end products.

Listed End Product

n/a

Listed Countries of Origin

n/a

(2) Certification. [If the Contracting Officer has identified end products and countries of origin in paragraph (i)(1) of this provision, then the offeror must certify to either (i)(2)(i) or (i)(2)(ii) by checking the appropriate block.]

[X] (i) The offeror will not supply any end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product.

[X] (ii) The offeror may supply an end product listed in paragraph (i)(1) of this provision that was mined, produced, or manufactured in the corresponding country as listed for that product. The offeror certifies that it has made a good faith effort to determine whether forced or indentured child labor was used to mine, produce, or manufacture any such end product furnished under this contract. On the basis of those efforts, the offeror certifies that it is not aware of any such use of child labor.

(j)(1) Annual Representations and Certifications. Any changes provided by the offeror in paragraph (j) of this provision do not automatically change the representations and certifications posted on the Online Representations and Certifications Application (ORCA) website. (2) The offeror has completed the annual representations and certifications electronically via the ORCA website at http://orca.bpn.gov. After reviewing the

ORCA database information, the offeror verifies by submission of this offer that the representations and certifications currently posted electronically at FAR 52.212-3, Offeror Representations and Certifications--Commercial items, have been entered or updated in the last 12 months, are current, accurate, complete, and applicable to this solicitation (including the business size standard applicable to the NAICS code referenced for this solicitation), as of the date of this offer and are incorporated in this offer by reference (see FAR 4.1201), except for paragraphs ----------.

[Offeror to identify the applicable paragraphs at (b) through (l) of this provision that the offeror has completed for the purposes of this solicitation only, if any. These amended representation(s) and/or certifica-tion(s) are also incorporated in this offer and are current, accurate, and complete as of the date of this offer. Any changes provided by the offeror are applicable to this solicitation only, and do not result in an update to the representations and certifications posted on ORCA.]

(End of Provision)

**ATTACHMENT – VA Form 2793 Shop Data Sheet (Artificial Limbs)** TO BE SUBMITTED WITH EACH OFFER

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |
| | | | | $ | $ |

32a. QUANTITY IN COLUMN 21 HAS BEEN

☐ RECEIVED ☐ INSPECTED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: ______

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELEPHONE NUMBER OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NO. | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | 37. CHECK NUMBER |
|---|---|---|---|---|
| ☐ PARTIAL ☐ FINAL | | | ☐ COMPLETE ☐ PARTIAL ☐ FINAL | |
| 38. S/R ACCOUNT NUMBER | 39. S/R VOUCHER NUMBER | 40. PAID BY | | |

| 41a. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY (Print) | |
|---|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41c. DATE | 42b. RECEIVED AT (Location) | |
| | | 42c. DATE REC'D (YY/MM/DD) / / | 42d. TOTAL CONTAINERS |

**PERFORMANCE, DELIVERY, INSPECTION AND ACCEPTANCE**

The VA shall require the contractor to deliver items ordered under this contract no later than 30 calendar days after receipt of a delivery order. The contractor shall notify the VA Prosthetic Representative and show cause in the event he is unable to deliver the required items in accordance with the Government's required delivery date. Failure by the contractor to provide a written notification as stated above within 7 calendar days after receipt of an order constitutes acceptance of an order.

In the event the Government desires expedited delivery, the ordering activity shall telephonically contact the contractor and inquire into the feasibility of obtaining this condition. The contractor shall respond within 24 hours to such request and expedited delivery shall be mutually agreed upon. Any additional costs incurred by the contractor for meeting this requirement shall be negotiated in accordance with clause 52.212-4, Contract Terms and Conditions--Commercial Items. (***Note: Expedited Delivery terms and conditions, when required, will be determined by the Contracting Officer or Ordering Officer on a case by case basis and stated in the individual task or delivery order***).

Typically, Veteran beneficiaries who are experienced prosthetic wearers will normally be measured, fitted, and accept delivery of their prosthesis at the contractor's facility. Veteran beneficiaries who are not experienced prosthetic wearers (first time prosthetic user) will normally be measured, fitted, and accept delivery at the ordering VA facility. The conditions of end point of measurement, fitting, delivery, inspection, and acceptance of prosthetic appliances shall be at the discretion of the Amputee Clinic Team, Prosthetic Representative, Chief of Prosthetics, or prescribing physician and will be determined on a case by case basis.

The contractor warrants the artificial limb provided against defective material and/or workmanship for a minimum of 90 calendar days from the date of acceptance. Manufacturer's warranties of artificial limb components that extend beyond the minimum 90-day period shall be in effect and also enforced. The contractor agrees to furnish without additional cost to the government, all labor and materials necessary to correct defects that were detected during the warranty period. These conditions do not apply to adjustments incidental to the wearing of prosthesis, adjustments required by physical change of the wearer, or where there is evidence of deliberate misuse or alteration by anyone other than the contractor.

The contractor shall immediately notify all effected VAMC (s) and contracting activities in the event of a product recall, removal, required adjustment, or required modification that is suggested or mandated by the contractor, distributor, manufacturer, or any regulatory or official agency. The information that shall be included in this notification includes:

1. A complete item description, identification.
2. Administrative identification data including contract number, order numbers, and order date.
3. Reasons for recall, removal, adjustment, or modification.
4. Instructions for appropriate corrective action.

**INVOICES**

Invoices submitted for payment shall include the contract number, purchase/delivery order number, beneficiary's name; detail of work accomplished. The preferred method of payment will be the Government Purchase/Visa Credit Card and the Contractor must be capable of accepting it for payment. The contractor will also need to be able to process at Level II. If this involves additional machinery or computers, this will be at the contractor's expense.

For those VAs using Government Purchase Card/Visa, a credit card receipt with the invoice and signed acceptance receipt must still be forwarded to the appropriate VA facility as soon as the transaction has been completed in accordance with the guidelines and time frames in utilizing the Government Purchase/Visa Credit Card.

## PART II - CONTRACT TERMS AND CONDITIONS

### 52.212-4 CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (SEP 2005)

(a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) Assignment. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (e.g., use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) Definitions. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies(or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include--

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, contract line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

(viii) Name, title, and phone number of person to notify in event of defective invoice; and

(ix) Taxpayer Identification Number (TIN). The Contractor shall include its TIN on the invoice only if required elsewhere in this contract.

(x) Electronic funds transfer (EFT) banking information.

(A) The Contractor shall include EFT banking information on the invoice only if required elsewhere in this contract.

(B) If EFT banking information is not required to be on the invoice, in order for the invoice to be a proper invoice, the Contractor shall have submitted correct EFT banking information in accordance with the applicable solicitation provision, contract clause (e.g., 52.232-33, Payment by Electronic Funds Transfer-- Central Contractor Registration, or 52.232-34, Payment by Electronic Funds Transfer--Other Than Central Contractor Registration), or applicable agency procedures.

(C) EFT banking information is not required if the Government waived the requirement to pay by EFT.

(2) Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) prompt payment regulations at 5 CFR part 1315.

(h) Patent indemnity. The Contractor shall indemnify the Government and its officers, employees and agents against liability, including costs, for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark or copyright, arising out of the performance of this contract, provided the Contractor is reasonably notified of such claims and proceedings.

(i) Payment.

(1) Items accepted. Payment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract.

(2) Prompt payment. The Government will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and prompt payment regulations at 5 CFR part 1315.

(3) Electronic Funds Transfer (EFT). If the Government makes payment by EFT, see 52.212-5(b) for the appropriate EFT clause.

(4) Discount. In connection with any discount offered for early payment, time shall be computed from the date of the invoice. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the specified payment date if an electronic funds transfer payment is made.

(5) Overpayments. If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall immediately notify the Contracting Officer and request instructions for disposition of the overpayment.

(j) Risk of loss. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

(k) Taxes. The contract price includes all applicable Federal, State, and local taxes and duties.

(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(n) Title. Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Government upon acceptance, regardless of when or where the Government takes physical possession.

(o) Warranty. The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract.

(p) Limitation of liability. Except as otherwise provided by an express warranty, the Contractor will not be liable to the Government for consequential damages resulting from any defect or deficiencies in accepted items.

(q) Other compliances. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract.

(r) Compliance with laws unique to Government contracts. The Contractor agrees to comply with 31 U.S.C. 1352 relating to limitations on the use of appropriated funds to influence certain Federal contracts; 18 U.S.C. 431 relating to officials not to benefit; 40 U.S.C 3701, et seq., Contract Work Hours and Safety Standards Act; 41 U.S.C. 51-58, Anti-Kickback Act of 1986; 41 U.S.C. 265 and 10 U.S.C. 2409 relating to whistle blower protections; 49 U.S.C 40118, Fly American; and 41 U.S.C. 423 relating to procurement integrity.

(s) Order of precedence. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order: (1) the schedule of supplies/services; (2) the Assignments, Disputes, Payments, Invoice, Other Compliances, and Compliance with Laws Unique to Government Contracts paragraphs of this clause; (3) the clause at 52.212-5; (4) addenda to this solicitation or contract, including any license agreements for computer software; (5) solicitation provisions if this is a solicitation; (6) other paragraphs of this clause; (7) the Standard Form 1449; (8) other documents, exhibits, and attachments; and (9) the specification.

(t) Central Contractor Registration (CCR).

(1) Unless exempted by an addendum to this contract, the Contractor is responsible during performance and through final payment of any contract for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(2)(i) If a Contractor has legally changed its business name, ``doing business as'' name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in FAR subpart

42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the CCR database; (B) comply with the requirements of subpart 42.12; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii) If the Contractor fails to comply with the requirements of paragraph (t)(2)(i) of this clause, or fails to perform the agreement at paragraph (t)(2)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the ``Suspension of Payment'' paragraph of the electronic funds transfer (EFT) clause of this contract.

(3) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of assignment of claims (see Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the CCR database. Information provided to the Contractor's CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the ``Suspension of payment'' paragraph of the EFT clause of this contract.

(4) Offerors and Contractors may obtain information on registration and annual confirmation requirements via the internet at http://www.ccr.gov or by calling 1-888-227-2423 or 269-961-5757.

(End of Clause)

**METRIC PRODUCTS:** Products manufactured to metric dimensions will be considered on an equal basis with those manufactured using inch-pound units, providing they fall within the tolerances specified using conversion tables contained in the latest revision of Federal Standard No. 376, and all other requirements of this document are met.

If a product is manufactured to metric dimensions and those dimensions exceed the tolerances specified in the inch-pound units, a request should be made to the Contracting Officer to determine if the product is acceptable. The Contracting Officer, in concert with the COTR will accept or reject the product.

**52.203-3 GRATUITIES (APR 1984)**

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative--

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled--

(1) To pursue the same remedies as in a breach of the contract; and

(2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

(End of Clause)

**52.204-7 Central Contractor Registration. (Oct 2003)**

(a) Definitions. As used in this clause-

"Central Contractor Registration (CCR) database" means the primary Government repository for Contractor information required for the conduct of business with the Government.

"Data Universal Numbering System (DUNS) number" means the 9-digit number assigned by Dun and Bradstreet, Inc. (D&B) to identify unique business entities.

"Data Universal Numbering System +4 (DUNS+4) number" means the DUNS number assigned by D&B plus a 4-character suffix that may be assigned by a business concern. (D&B has no affiliation with this 4-character suffix.) This 4-character suffix may be assigned at the discretion of the business concern to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see the FAR at Subpart 32.11) for the same parent concern.

"Registered in the CCR database" means that-
(1) The Contractor has entered all mandatory information, including the DUNS number or the DUNS+4 number, into the CCR database; and
(2) The Government has validated all mandatory data fields and has marked the record "Active".

(b)(1) **The Contractor shall be registered in the CCR database by MARCH 31, 2004**. The Contractor shall maintain registration during performance and through final payment of this contract.

(2) The Contractor shall enter, in the block with its name and address on the cover page of the SF 30, Amendment of solicitation/Modification of Contract, the annotation "DUNS" or "DUNS +4" followed by the DUNS or DUNS +4 number that identifies the Contractor's name and address exactly as stated in this contract. The DUNS number will be used by the Contracting Officer to verify that the Contractor is registered in the CCR database.
(c) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one.
(1) An offeror may obtain a DUNS number-
(i) If located within the United States, by calling Dun and Bradstreet at 1-866-705-5711 or via the Internet at *http://www.dnb.com*; or
(ii) If located outside the United States, by contacting the local Dun and Bradstreet office.
(2) The offeror should be prepared to provide the following information:
(i) Company legal business.
(ii) Tradestyle, doing business, or other name by which your entity is commonly recognized.
(iii) Company Physical Street Address, City, State, and Zip Code.
(iv) Company Mailing Address, City, State and Zip Code (if separate from physical).
(v) Company Telephone Number.
(vi) Date the company was started.
(vii) Number of employees at your location.
(viii) Chief executive officer/key manager.
(ix) Line of business (industry).
(x) Company Headquarters name and address (reporting relationship within your entity).
(d) If the Offeror does not become registered in the CCR database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror.
(e) Processing time, which normally takes 48 hours, should be taken into consideration when registering. Offerors who are not registered should consider applying for registration immediately upon receipt of this solicitation.
(f) The Contractor is responsible for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it

is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.
(g) (1) (i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in Subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to (A) change the name in the CCR database; (B) comply with the requirements of Subpart 42.12 of the FAR; and (C) agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.
(ii) If the Contractor fails to comply with the requirements of paragraph (g)(1)(i) of this clause, or fails to perform the agreement at paragraph (g)(1)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.
(2) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of assignment of claims (see FAR Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the CCR database. Information provided to the Contractor's CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.
(h) Offerors and Contractors may obtain information on registration and annual confirmation requirements via the internet at *http://www.ccr.gov* or by calling 1-888-227-2423, or 269-961-5757.

(End of clause)

**52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

FAR www.arnet.gov/far/
VAAR www.va.gov/oamm/vaar/index.htm

(end of clause)

(A) FEDERAL ACQUISITION REGULATIONS (48 CFR CHAPTER 1):

| | | |
|---|---|---|
| 52.232-18 | AVAILABILITY OF FUNDS. | APR 1984 |
| 52.232-38 | SUBMISSION OF ELECTRONIC FUNDS TRANSFER INFORMATION WITH OFFER | MAY 1999 |

**52.216-1 TYPE OF CONTRACT (APR 1984)**

The Government contemplates award of an Indefinite Delivery Indefinite Quantity Firm Fixed Price contract resulting from this solicitation.

(End of Provision)

52.216-18 ORDERING (OCT 1995)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from award of contract through completion of contract.

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(End of clause)

52.216-19 ORDER LIMITATIONS (OCT 1995)

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than quantity stated in schedule of items, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor -

(1) Any order for a single item in excess of _$50,000.00;

(2) Any order for a combination of items in excess of $100,000.00; or

(3) A series of orders from the same ordering office within two (2) days that together call for quantities exceeding the limitation in subparagraph (b)(1) or (2) of this section.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within five (5) days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(End of clause)

52.216-22 INDEFINITE QUANTITY (OCT 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after contract completion.

(End of clause)

**52.217-8 OPTION TO EXTEND SERVICES (NOV 1999)**

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days of contract expiration.

(End of clause)

**52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT. (MAR 2000)**

(a) The Government may extend the term of this contract by written notice to the Contractor within the time specified in the contract; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least 30 days before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed the time specified in the contract.

(end of clause)

**52.232-17 INTEREST (JUN 1996)**

(a) Except as otherwise provided in this contract under a Price Reduction for Defective Cost or Pricing Data clause or a Cost Accounting Standards clause, all amounts that become payable by the Contractor to the Government under this contract (net of any applicable tax credit under the Internal Revenue Code (26 U.S.C. 1481)) shall bear simple interest from the date due until paid unless paid within 30 days of becoming due. The interest rate shall be the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of this clause, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

(b) Amounts shall be due at the earliest of the following dates:

(1) The date fixed under this contract.

(2) The date of the first written demand for payment consistent with this contract, including any demand resulting from a default termination.

(3) The date the Government transmits to the Contractor a proposed supplemental agreement to confirm completed negotiations establishing the amount of debt.

(4) If this contract provides for revision of prices, the date of written notice to the Contractor stating the amount of refund payable in connection with a pricing proposal or a negotiated pricing agreement not confirmed by contract modification.

(c) The interest charge made under this clause may be reduced under the procedures prescribed in 32.614-2 of the Federal Acquisition Regulation in effect on the date of this contract.

(End of Clause)

**52.232-19 AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984)**

Funds are not presently available for performance under this contract beyond September 30, 2006. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30, 2006, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

**52.232-37 MULTIPLE PAYMENT ARRANGEMENTS (MAY 1999)**

This contract or agreement provides for payments to the Contractor through several alternative methods. The applicability of specific methods of payment and the designation of the payment office(s) are either stated--

(a) Elsewhere in this contract or agreement; or

(b) In individual orders placed under this contract or agreement.

(End of Clause)

**52.242-13 BANKRUPTCY (JUL 1995)**

In the event the Contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the Contractor agrees to furnish, by certified mail or electronic commerce method authorized by the contract, written notification of the bankruptcy to the Contracting Officer responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of Government contract numbers and contracting offices for all Government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

(End of Clause)

**852.203-71 DISPLAY OF VA HOTLINE POSTER (DEC 1992)**

Except as provided in paragraph (c) below, the Contractor shall display prominently in common work areas within business segments performing work under VA contracts, VA Hotline posters prepared by the VA Office of the Inspector General.

VA Hotline posters may be obtained from the VA Office of the Inspector General (53E), P.O. Box 34647, Washington, DC 20043-4647.

The Contractor need not comply with paragraph (a) above, if the Contractor has established a mechanism, such as a hotline, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports.

(End of clause)

**852.237-70 CONTRACTOR RESPONSIBILITIES (APR 1984)**

The contractor shall obtain all necessary licenses and/or permits required to perform this work. He/she shall take all reasonable precautions necessary to protect persons and property from injury or damage during the performance of this contract. He/she shall be responsible for any injury to himself/herself, his/her employees, as well as for any damage to personal or public property that occurs during the performance of this contract that is caused by his/her employees fault or negligence, and shall maintain personal liability and property damage insurance having coverage for a limit as required by the laws of the State of Minnesota; North Dakota and South Dakota dependent on geographic area assigned to contractor. Further, it is agreed that any negligence of the Government, its officers, agents, servants and employees, shall not be the responsibility of the contractor hereunder with the regard to any claims, loss, damage, injury, and liability resulting there from.

(End of clause)

**852.270-4 COMMERCIAL ADVERTISING. (NOV 1984)**

The bidder or Offeror agrees that if a contract is awarded to him/her, as a result of this solicitation, he/she will not advertise the award of the contract in his/her commercial advertising in such a manner as to state or imply that the Department of Veterans Affairs endorses a product, project or commercial line of endeavor.

(End of clause)

**52.212-5 CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (JUNE 2006)**

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:

(1)52.233-3, Protest after Award (AUG 1996) (31 U.S.C. 3553).

(2)52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Pub. L. 108-77, 108-78)

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items: [Contracting Officer check as appropriate.]

[X] (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (JUL 1995), with Alternate I (OCT 1995)(41 U.S.C. 253g and 10 U.S.C. 2402).

[N/A] (2) 52.219-3, Notice of Total HUBZone Set-Aside (JAN 1999) (15 U.S.C. 657a).

[N/A] (3) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (JUL 2005) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

[ ] (4) [Reserved]

[N/A] (5)(i) 52.219-6, Notice of Total Small Business Set-Aside (JUNE 2003) (15 U.S.C. 644).

[N/A] (ii) Alternate I (OCT 1995) of 52.219-6.

N/A] (iii) Alternate II (MAR 2004) of 52.219-6.

[X] (6)(i) 52.219-7, Notice of Partial Small Business Set-Aside (JUNE 2003) (15 U.S.C. 644).

[N/A] (ii) Alternate I (OCT 1995) of 52.219-7.

[N/A] (iii) Alternate II (MAR 2004) of 52.219-7.

[X] (7) 52.219-8, Utilization of Small Business Concerns (MAY 2004) (15 U.S.C. 637 (d)(2) and (3)).

X] (8)(i) 52.219-9, Small Business Subcontracting Plan (JUL 2005) (15 U.S.C. 637(d)(4)).

[N/A] (ii) Alternate I (OCT 2001) of 52.219-9.

[N/A] (iii) Alternate II (OCT 2001) of 52.219-9.

[X] (9) 52.219-14, Limitations on Subcontracting (DEC 1996) (15 U.S.C. 637(a)(14)).

[N/A] (10)(i) 52.219-23, Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (SEP 2005) (10 U.S.C. 2323) (if the offeror elects to waive the adjustment, it shall so indicate in its offer).

[N/A] (ii) Alternate I (JUNE 2003) of 52.219-23.

[N/A] (iii) Alternate II (OCT 1998) of 52.219-23.

[N/A] (11) 52.219-25, Small Disadvantaged Business Participation Program--Disadvantaged Status and Reporting (OCT 1999) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

[N/A] (12) 52.219-26, Small Disadvantaged Business Participation Program--Incentive Subcontracting (OCT 2000) (Pub. L. 103-355, section 7102, and 10 U.S.C. 2323).

[N/A] (13) 52.219-27, Notice of Total Service-Disabled Veteran-Owned Small Business Set-Aside (May 2004)

[X] (14) 52.222-3, Convict Labor (JUNE 2003) (E.O. 11755).

[X] (15) 52.222-19, Child Labor--Cooperation with Authorities and Remedies (JAN 2006) (E.O. 13126).

[X] (16) 52.222-21, Prohibition of Segregated Facilities (FEB 1999).

[X] (17) 52.222-26, Equal Opportunity (APR 2002) (E.O. 11246).

[X] (18) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (DEC 2001) (38 U.S.C. 4212).

[X] (19) 52.222-36, Affirmative Action for Workers with Disabilities (JUN 1998) (29 U.S.C. 793).

[X] (20) 52.222-37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (DEC 2001) (38 U.S.C. 4212).

[X] (21)52.222-39, Notification of Employee Rights Concerning Payment of Union Dues or Fees (DEC 2004) (E.O. 13201).

[X] (22)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Products (AUG 2000) (42 U.S.C. 6962(c)(3)(A)(ii)).

[N/A] (ii) Alternate I (AUG 2000) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)).

[N/A] (23) 52.225-1, Buy American Act--Supplies (JUNE 2003) (41 U.S.C. 10a-10d).

[X] (24)(i) 52.225-3, Buy American Act--Free Trade Agreements-- Israeli Trade Act (APRIL 2006) (41 U.S.C. 10a-10d, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, Pub. L. 108-77, 108-78, 108-286).

[] (ii) Alternate I (JAN 2006) of 52.225-3.

[] (iii) Alternate II (JAN 2006) of 52.225-3.

[X] (25) 52.225-5, Trade Agreements (APRIL 2006) (19 U.S.C. 2501, et seq., 19 U.S.C. 3301 note).

[X] (26) 52.225-13, Restrictions on Certain Foreign Purchases (FEB 2006) (E.O.s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).

[ ] (27) [Reserved]

[ ] (28) [Reserved]

[N/A] (29) 52.232-29, Terms for Financing of Purchases of Commercial Items (FEB 2002) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

[N/A] (30) 52.232-30, Installment Payments for Commercial Items (OCT 1995) (41 U.S.C. 255(f), 10 U.S.C. 2307(f)).

[N/A] (31) 52.232-33, Payment by Electronic Funds Transfer--Central Contractor Registration (OCT 2003) (31 U.S.C. 3332).

[X] (32) 52.232-34, Payment by Electronic Funds Transfer--Other than Central Contractor Registration (MAY 1999) (31 U.S.C. 3332).

[X] (33) 52.232-36, Payment by Third Party (MAY 1999) (31 U.S.C. 3332).

[N/A] (34) 52.239-1, Privacy or Security Safeguards (AUG 1996) (5 U.S.C. 552a).

[N/A] (35)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (FEB 2006) (46 U.S.C. Appx 1241(b) and 10 U.S.C. 2631).

[N/A] (ii) Alternate I (APR 2003) of 52.247-64.

(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items: [Contracting Officer check as appropriate.]

[N/A] (1) 52.222-41, Service Contract Act of 1965, as Amended (JUL 2005) (41 U.S.C. 351, et seq.).

[N/A] (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 1989) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

[N/A] (3) 52.222-43, Fair Labor Standards Act and Service Contract Act--Price Adjustment (Multiple Year and Option Contracts) (MAY 1989) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

[N/A] (4) 52.222-44, Fair Labor Standards Act and Service Contract Act--Price Adjustment (February 2002) (29 U.S.C. 206 and 41 U.S.C. 351, et seq.).

[N/A] (5) 52.222-47, SCA Minimum Wages and Fringe Benefits Applicable to Successor Contract Pursuant to Predecessor Contractor Collective Bargaining Agreements (CBA) (May 1989) (41 U.S.C. 351, et seq.).

(d) Comptroller General Examination of Record. The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, and does not contain the clause at 52.215-2, Audit and Records--Negotiation.

(1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.

(2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.

(3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in paragraphs (i) through (vi) of this paragraph in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause--

(i) 52.219-8, Utilization of Small Business Concerns (May 2004) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds $500,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

(ii) 52.222-26, Equal Opportunity (April 2002) (E.O. 11246).

(iii) 52.222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (December 2001) (38 U.S.C. 4212).

(iv) 52.222-36, Affirmative Action for Workers with Disabilities (June 1998) (29 U.S.C. 793).

(v) 52.222-39, Notification of Employee Rights Concerning Payment of Union Dues or Fees (DEC 2004) (E.O. 13201).

(vi)52.222-41, Service Contract Act of 1965, as Amended (JUL 2005), flow down required for all subcontracts subject to the Service Contract Act of 1965 (41 U.S.C. 351, et seq.).

(vii) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (FEB 2006) (46 U.S.C. Appx 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the contractor may include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

(End of Clause)

**52.212-1 INSTRUCTIONS TO OFFERORS--COMMERCIAL ITEMS (JAN 2006)**

(a) North American Industry Classification System (NAICS) code and small business size standard. The NAICS code and small business size standard for this acquisition appear in Block 10 of the solicitation cover sheet (SF 1449). However, the small business size standard for a concern which submits an offer in its own name, but which proposes to furnish an item which it did not itself manufacture, is 500 employees.

(b) Submission of offers. Submit signed and dated offers to the office specified in this solicitation at or before the exact time specified in this solicitation. Offers may be submitted on the SF 1449, letterhead stationery, or as otherwise specified in the solicitation. As a minimum, offers must show --

(1) The solicitation number;

(2) The time specified in the solicitation for receipt of offers;

(3) The name, address, and telephone number of the offeror;

(4) A technical description of the items being offered in sufficient detail to evaluate compliance with the requirements in the solicitation. This may include product literature, or other documents, if necessary;

(5) Terms of any express warranty;

(6) Price and any discount terms;

(7) "Remit to" address, if different than mailing address;

(8) A completed copy of the representations and certifications at FAR 52.212-3 (see FAR 52.212-3(j) for those representations and certifications that the offeror shall complete electronically);

(9) Acknowledgment of Solicitation Amendments;

(10) Past performance information, when included as an evaluation factor, to include recent and relevant contracts for the same or similar items and other references (including contract numbers, points of contact with telephone numbers and other relevant information); and

(11) If the offer is not submitted on the SF 1449, include a statement specifying the extent of agreement with all terms, conditions, and provisions included in the solicitation. Offers that fail to furnish required representations or information, or reject the terms and conditions of the solicitation may be excluded from consideration.

(c) Period for acceptance of offers. The offeror agrees to hold the prices in its offer firm for 30 calendar days from the date specified for receipt of offers, unless another time period is specified in an addendum to the solicitation.

(d) Product samples. When required by the solicitation, product samples shall be submitted at or prior to the time specified for receipt of offers. Unless otherwise specified in this solicitation, these samples shall be submitted at no expense to the Government, and returned at the sender's request and expense, unless they are destroyed during preaward testing.

(e) Multiple offers. Offerors are encouraged to submit multiple offers presenting alternative terms and conditions or commercial items for satisfying the requirements of this solicitation. Each offer submitted will be evaluated separately.

(f) Late submissions, modifications, revisions, and withdrawals of offers.

(1) Offerors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation. If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office on the date that offers or revisions are due.

(2)(i) Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and--

(A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

(B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(C) If this solicitation is a request for proposals, it was the only proposal received.

(ii) However, a late modification of an otherwise successful offer, that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

(3) Acceptable evidence to establish the time of receipt at the Government installation includes the time/date stamp of that installation on the offer wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.

(4) If an emergency or unanticipated event interrupts normal Government processes so that offers cannot be received at the Government office designated for receipt of offers by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation or other notice of an extension of the closing date, the time specified for receipt of offers will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

(5) Offers may be withdrawn by written notice received at any time before the exact time set for receipt of offers. Oral offers in response to oral solicitations may be withdrawn orally. If the solicitation authorizes facsimile offers, offers may be withdrawn via facsimile received at any time before the exact time set for receipt of offers, subject to the conditions specified in the solicitation concerning facsimile offers. An offer may be withdrawn in person by an offeror or its authorized representative if, before the exact time set for receipt of offers, the identity of the person requesting withdrawal is established and the person signs a receipt for the offer.

(g) Contract award (not applicable to Invitation for Bids). The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

(h) Multiple awards. The Government may accept any item or group of items of an offer, unless the offeror qualifies the offer by specific limitations. Unless otherwise provided in the Schedule, offers may not be submitted for quantities less than those specified. The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit prices offered, unless the offeror specifies otherwise in the offer.

(i) Availability of requirements documents cited in the solicitation.

(1)(i) The GSA Index of Federal Specifications, Standards and Commercial Item Descriptions, FPMR Part 101-29, and copies of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained for a fee by submitting a request to—

GSA Federal Supply Service Specifications Section Suite 8100 470 East L'Enfant Plaza, SW, Washington, DC 20407

Telephone (202) 619-8925 Facsimile (202) 619-8978.

(ii) If the General Services Administration, Department of Agriculture, or Department of Veterans Affairs issued this solicitation, a single copy of specifications, standards, and commercial item descriptions cited in this solicitation may be obtained free of charge by submitting a request to the addressee in paragraph (i)(1)(i) of this provision. Additional copies will be issued for a fee.

(2) Most unclassified Defense specifications and standards may be downloaded from the following ASSIST websites:

(i) ASSIST (http://assist.daps.dla.mil).

(ii) Quick Search (http://assist.daps.dla.mil/quicksearch).

(iii) ASSISTdocs.com (http://assistdocs.com).

(3) Documents not available from ASSIST may be ordered from the Department of Defense Single Stock Point (DoDSSP) by—

(i) Using the ASSIST Shopping Wizard (http://assist.daps.dla.mil/wizard);

(ii) Phoning the DoDSSP Customer Service Desk (215) 697-2179, Mon-Fri, 0730 to 1600 EST; or

(iii) Ordering from DoDSSP, Building 4, Section D, 700 Robbins Avenue, Philadelphia, PA 19111-5094, Telephone (215) 697-2667/2179, Facsimile (215) 697-1462.

(4) Nongovernment (voluntary) standards must be obtained from the organization responsible for their preparation, publication, or maintenance.

(j) Data Universal Numbering System (DUNS) Number. (Applies to all offers exceeding $25,000, and offers of $25,000 or less if the solicitation requires the Contractor to be registered in the Central Contractor Registration (CCR) database. The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation ``DUNS" or ``DUNS +4" followed by the DUNS or DUNS +4 number that identifies the offeror's name and address. The DUNS +4 is the DUNS number plus a 4-character suffix that may be assigned at the discretion of the offeror to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see FAR Subpart 32.11) for the same parent concern. If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one. An offeror within the United States may contact Dun and Bradstreet by calling 1-866-705-5711 or via the internet at http://www.dnb.com. An offeror located outside the United States must contact the local Dun and Bradstreet office for a DUNS number.

(k) Central Contractor Registration. Unless exempted by an addendum to this solicitation, by submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the CCR database prior to award, during performance and through final payment of any contract resulting from this solicitation. If the Offeror does not become registered in the CCR database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror. Offerors may obtain information on registration and annual confirmation requirements via the internet at http://www.ccr.gov or by calling 1-888-227-2423 or 269-961-5757.

(l) Debriefing. If a post-award debriefing is given to requesting offerors, the Government shall disclose the following information, if applicable:

(1) The agency's evaluation of the significant weak or deficient factors in the debriefed offeror's offer.

(2) The overall evaluated cost or price and technical rating of the successful and the debriefed offeror and past performance information on the debriefed offeror.

(3) The overall ranking of all offerors, when any ranking was developed by the agency during source selection.

(4) A summary of the rationale for award;

(5) For acquisitions of commercial items, the make and model of the item to be delivered by the successful offeror.

(6) Reasonable responses to relevant questions posed by the debriefed offeror as to whether source-selection procedures set forth in the solicitation, applicable regulations, and other applicable authorities were followed by the agency.

(End of Provision)

**PERFORMANCE, DELIVERY, INSPECTION AND ACCEPTANCE**

The VA shall require the contractor to deliver items ordered under this contract no later than 30 calendar days after receipt of a delivery order. The contractor shall notify the VA Prosthetic Representative and show cause in the event he is unable to deliver the required items in accordance with the Government's required delivery date. Failure by the contractor to provide a written notification as stated above within 7 calendar days after receipt of an order constitutes acceptance of an order.

In the event the Government desires expedited delivery, the ordering activity shall telephonically contact the contractor and inquire into the feasibility of obtaining this condition. The contractor shall respond within 24 hours to such request and expedited delivery shall be mutually agreed upon. Any additional costs incurred by the contractor for meeting this requirement shall be negotiated in accordance with clause 52.212-4, Contract Terms and Conditions--Commercial Items. (***Note: Expedited Delivery terms and conditions, when required, will be determined by the Contracting Officer or Ordering Officer on a case by case basis and stated in the individual task or delivery order***).

Typically, Veteran beneficiaries who are experienced prosthetic wearers will normally be measured, fitted, and accept delivery of their prosthesis at the contractor's facility. Veteran beneficiaries who are not experienced prosthetic wearers (first time prosthetic user) will normally be measured, fitted, and accept delivery at the ordering VA facility. The conditions of and point of measurement, fitting, delivery, inspection, and acceptance of prosthetic appliances shall be at the discretion of the Amputee Clinic Team, Prosthetic Representative, Chief of Prosthetics, or prescribing physician and will be determined on a case by case basis.

The contractor warrants the artificial limb provided against defective material and/or workmanship for a minimum of 90 calendar days from the date of acceptance. Manufacturer's warranties of artificial limb components that extend beyond the minimum 90-day period shall be in effect and also enforced. The contractor agrees to furnish without additional cost to the government, all labor and materials necessary to correct defects that were detected during the warranty period. These conditions do not apply to adjustments incidental to the wearing of prosthesis, adjustments required by physical change of the wearer, or where there is evidence of deliberate misuse or alteration by anyone other than the contractor.

The contractor shall immediately notify all effected VAMC (s) and contracting activities in the event of a product recall, removal, required adjustment, or required modification that is suggested or mandated by the contractor, distributor, manufacturer, or any regulatory or official agency. The information that shall be included in this notification includes:

1. A complete item description, identification.
2. Administrative identification data including contract number, order numbers, and order date.
3. Reasons for recall, removal, adjustment, or modification.
4. Instructions for appropriate corrective action.

**INVOICES**

Invoices submitted for payment shall include the contract number, purchase/delivery order number, beneficiary's name; detail of work accomplished. The preferred method of payment will be the Government Purchase/Visa Credit Card and the Contractor must be capable of accepting it for payment. The contractor will also need to be able to process at Level II. If this involves additional machinery or computers, this will be at the contractor's expense.

For those VAs using Government Purchase Card/Visa, a credit card receipt with the invoice and signed acceptance receipt must still be forwarded to the appropriate VA facility as soon as the transaction has been completed in accordance with the guidelines and time frames in utilizing the Government Purchase/Visa Credit Card.

**JOINT COMMISSION ON ACCREDITATION OF HEALTH CARE ORGANIZATIONS (JCAHO) AND OTHER SPECIAL REQUIREMENTS**

Where the contract does not require JCAHO accreditation or other regulatory requirements regarding worker competency, the Contractor must perform the required work in accordance with JCAHO standards. The Contractor must demonstrate that he/she has met or exceeded JCAHO requirements. The contractor is required to develop and maintain the following documents for each Contractor employee working on the contract: credentials and qualifications for the job; a current competence assessment checklist (an assessment of knowledge, skills, abilities and behaviors required to perform a job correctly and skillfully; includes knowledge and skills required to provide care for certain patient populations, as appropriate.); a current performance evaluation supporting ability of the Contractor employee to successfully perform the work required in this solicitation; and listing of relevant continuing education for the last two years. The Contractor will provide current copies of these records at the time of contract award and annually on the anniversary date of contract award to the VA COTR, or upon request, for each Contractor employee working on the contract.

The Contractor must demonstrate that he/she has met or exceeded industry accreditation requirements.

The Contractor will be responsible to ensure that Contractor employees providing work on this contract are fully trained and completely competent to perform the required work.

The Contractor is required to maintain records that document competence/performance level of Contractor employees working on this contract in accordance with regulatory body requirements. The Contractor will provide a current copy of the competence assessment checklist and annual performance evaluation to the Contracting Officer's Technical Representative (COTR) for each Contractor employee working on this contract.

When changes in Contractor personnel are approved in accordance with the "Key Personnel" clause of the contract, the Contractor must provide evidence of orientation, the current competence assessment, and current performance evaluation that supports the above.

**KEY PERSONNEL AND TEMPORARY EMERGENCY SUBSTITUTIONS:**

The Contractor shall assign to this contract the following key personnel: **all individuals providing supplies and services to VA Beneficiaries AND for whom information about education and training is required to be submitted as a part of the response to this Request for Quotation including, but not necessarily limited to, those individuals who must meet the training requirements set forth in the GENERAL REQUIREMENTS SECTION.**

a. During the first ninety (90) days of performance, the Contractor shall make NO substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment. The Contractor shall notify the Contracting Officer, in writing, within 15 calendar days after the occurrence of any of these events and provide the information required by paragraph (c) below. After the initial 90-day period of the contract, the Contractor shall submit the information required by paragraph (c) to the Contracting Officer at least 15 days prior to making any permanent substitutions.

b. The Contractor shall provide a detailed explanation of the circumstances necessitating the proposed substitutions, complete resumes for the proposed substitutes, and any additional information requested by the Contracting Officer. Proposed substitutes shall have comparable qualifications to those of the persons being replaced. The Contracting Officer will notify the Contractor within 15 calendar days after receipt of all required information of the decision on the proposed substitutes. The contract will be modified to reflect any approved changes of key personnel. If the VA does not agree with the proposed substitutes and their qualifications, then VA will terminate the contract and the contractor will not get the $500.00 minimum.

c. For temporary substitutions where the key person will not be reporting to work for three (3) consecutive work days or more, the Contractor will provide a qualified replacement for the key person. This substitute shall have comparable qualifications to the key person. Any period exceeding two weeks will require the procedure stated in paragraph (b) above.

CONFIDENTIALITY OF PATIENT RECORDS (If necessary)

The Contractor is a VA contractor and will assist in the provision of health care to patients seeking such care from or through VA. As such, the Contractor is considered as being part of the Department health care activity. The contractor is considered to be a VA contractor for purposes of the Privacy Act, Title 5 U.S.C. 552a. Further, for the purpose of VA records access and patient confidentiality, Contractor is considered to be a VA contractor for the following provisions: Title 38 U.S.C. 5701, 5705, and 7362. Therefore, Contractor may have access, as would other appropriate components of VA, to patient medical records including patient treatment records pertaining to drug and alcohol abuse, HIV, and sickle cell anemia, to the extent necessary to perform its contractual responsibilities. However, like other components of the Department, and not withstanding any other provisions of the sharing agreement, the Contractor is restricted from making disclosures of VA records, or information contained in such records, to which it may have access, except to the extent that explicit disclosure authority from VA has been received. The Contractor is subject to the same penalties and liabilities for unauthorized disclosures of such records as VA. The records referred to above shall be and remain the property of VA and shall not be removed or transferred from VA except in accordance with U.S.C.552a (Privacy Act), 38 U.S.C. 5701 (Confidentiality of claimants records), 5 U.S.C. 552 (FOIA), 38 U.S.C. 5705 (Confidentiality of Medical Quality Assurance Records) 38 U.S.C. 7332 (Confidentiality of certain medical records) and federal laws, rules and regulations. Subject to applicable federal confidentiality or privacy laws, the Contractor, or their designated representatives, and designated representatives of federal regulatory agencies having jurisdiction over Contractor, may have access to VA 's records, at VA's place of business on request during normal business hours, to inspect and review and make copies of such records.

REQUIRED REGISTRATION WITH CONTRACTOR PERFORMANCE SYSTEM (CPS)

(a) As prescribed in Federal Acquisition Regulation (FAR) Part 42.15, the Department of Veterans Affairs (VA) evaluates contractor past performance on all contracts that exceed $100,000, and shares those evaluations with other Federal Government contract specialists and procurement officials. The FAR requires that the contractor be provided an opportunity to comment on past performance evaluations prior to each report closing. To fulfill this requirement VA uses an online database, the Contractor Performance System (CPS), which is maintained by the National Institutes of Health (NIH). The CPS database information is shared with the Past Performance Information Retrieval System (PPIRS) database, which is available to all Federal agencies.

(b) Each contractor whose contract award is estimated to exceed $100,000 is required to register with the NIH CPS database at the following web address: https://cpscontractor.nih.gov. Help in registering can be obtained by contacting CPS Support E-mail (cps-support-l@list.nih.gov) or by calling (301) 451-2771. Registration should occur no later than thirty days after contract award, and must be kept current should there be any change to the contractor's registered representative.

(c) For contracts with a period of one year or less, the contracting officer will perform a single evaluation when the contract is complete. For contracts exceeding one year, the contracting officer will evaluate the contractor's performance annually. Interim reports will be filed each year until the last year of the contract, when the final report will be completed. The report shall be assigned in CPS to the contractor's designated representative for comment. The contractor representative will have thirty days to submit any comments and re-assign the report to the VA contracting officer.

(d) Failure to have a current registration with the NIH CPS database, or to re-assign the report to the VA contracting officer within those thirty days, will result in the Government's evaluation being placed on file in the database with a statement that the contractor failed to respond.

END SPECIAL CONTRACT REQUIREMENTS

**DEFINITIONS:**

**GOOD STANDING**: participates and achieves appropriate continuing education credits and pays dues as determined by Certifying Agency such as ABC or BOC.

**PURCHASE CARD/VISA LEVEL II**: Enhanced data is the additional information that accompanies charge card transactions. However, enhanced data is not required for processing financial transactions or for settlement of that transaction. Level II provides additional summary data that accompanies Level I (minimum amount of data required to clear and settle a financial transaction) through the clearing and settlement process.

**MULTIPLE AWARDS**

The Contracting Officer contemplates award of one or more Indefinite Delivery Indefinite Quantity (IDIQ) firm fixed price contract(s) pursuant to this solicitation for Artificial Limbs and related services. Any VA facility within Lexington, KY may order from contract(s) awarded under this solicitation.

The contract will contain one (1) base year and two (2) renewable option years. The Contracting Officer shall determine (based on an integrated assessment of each offeror's technical and price proposals) the individual proposals judged to be most advantageous to the Government.

- The total guaranteed minimum of supplies and services that will be acquired under this contract is $500.00 per contract per year.
- The total maximum of supplies or services the Government will acquire under the contract is $500,000.00 annually.
- The Contractor must submit a Technical Proposal for evaluation. The Technical Proposal must provide sufficient information to demonstrate the corporate capabilities to satisfactorily perform the work detailed.

**END OF CONTRACT ADMINISTRATION DATA**

BACKGROUND: In fiscal year 2005, the VA Medical Center listed above, on a combined basis, expended an average of:

| ITEM | # ISSUED | AVERAGE COST |
|---|---|---|
| Temporary Legs | 10 | $3,478.00 |
| Symes | 1 | $3,228.00 |
| Below Knee | 18 | $4,669.00 |
| Above Knee | 6 | |
| Below elbow arm | 3 | $4,916.00 |
| Above elbow arm | 2 | $3,350.00 |
| **Repairs** | | |
| Below Knee | 15 | $274.00 |
| Above Knee | 12 | $874.00 |
| All other legs | 175 | $329.00 |
| Artificial Arms | 1 | $252.00 |

## GENERAL REQUIREMENTS

**Standards of Performance**
The Contractor shall fabricate all artificial limbs in strict conformance to the prosthetic prescription that has been provided by the VA Amputee Clinic Team. Contractors shall not add or substitute components or alter the beneficiary's limb prescription in any way without prior approval and written authority from the VA Amputee Clinic Team Prosthetic Representative or designee.

**Educational and Training Requirements**
All contractors shall have a full-time American Board Certified (ABC), or Board for Orthotist-Prosthetist Certification (BOC), or VA Qualified (VAQP) Prosthetist on staff at each of their locations in good standing. A waiver for this requirement may be granted on a case-by-case basis for branch offices only in the event that VA determines this requirement would place an undue burden on the veteran. VA reserves the right to verify Prosthetist(s) credentials anytime during the term of this contract. See FAR Clause 52.212-4 paragraph (m).

**Special Education Requirements for Certain Prostheses**
The fitting and alignment of the following prostheses/services must be performed under the supervision of a Prosthetist who has met the applicable educational and training requirements.

(1) Ischial Containment Prosthetic Designs
  Natural Shape / Natural Aligned Sockets (NSNA) (Also known as Long's Line or technique)
  Icelandic Scandanavian New York (ISNY)
  Flexible Wall Sockets (FWS)
  Contoured Adducted Trochanteric-Controlled Alignment Method (CAT/CAM)
(2) Microprocessor knee
(3) Silicone suction sockets (3S)
(4) Tec Harmony System

At a minimum, this training shall include CAD/CAM, Longs Technique, NSNA, and/or educational seminars specific to the fabrication and servicing of these components that were presented by organizations such as National Association for the Advancement of Orthotics and Prosthetics (NAAOP), American Academy of Orthotics and Prosthetics (AAOP), American Orthotic and Prosthetic Association (AOPA), International Association of Orthotics and Prosthetics (IAOP), or a formal program which is specifically designed to train Prosthetist in the fabrication of these sockets.

Approved Facilities

The contractor's facilities shall be approved by the Facility Accreditation Program of the American Board for Certification in Orthotics and Prosthetics, Inc. (ABC), the Accredited Facilities Program of the Board of Certification (BOC), or have successfully passed inspection by VA. VA reserves the right to inspect the contractor's facilities. VA inspection will be conducted by VA facility closest to awarded contractor facility.

SPECIFIC REQUIREMENTS

**The contractor will be required to be a part of the Amputee Clinic Team and attend clinic meetings as scheduled.**

Solicitation of Beneficiaries

The contractor agrees not to directly or indirectly through agents solicits eligible veteran beneficiaries. VA personnel shall not direct, guide, or prompt a veteran beneficiary to a specific contractor except when a physician determines that it is a medical necessity. To assist in the selection of their Prosthetist, all eligible veteran beneficiaries shall be given a current list of contract providers located within the VISN Medical Center jurisdiction. The list of contract providers shall contain the following header statement in boldface type:

**YOU HAVE THE RIGHT TO SELECT THE ARTIFICIAL LIMB CONTRACTOR OF YOUR CHOICE FROM ANY OF THE VA APPROVED CONTRACTORS. ANY ATTEMPT TO INFLUENCE YOUR DECISION OR TO DIRECT YOU TO ANY PARTICULAR CONTRACTOR SHOULD BE REPORTED TO THE MEDICAL CENTER DIRECTOR OF THIS FACILITY.**

It will continue to be VA's policy to permit all service-connected and non service-connected amputees who have continuing eligibility and who have established ties with an existing Prosthetist to continue to use that Prosthetist provided that Prosthetist is willing to accept the current contract provider terms for the geographic area covered by the contract.

Loaner Hydraulic Unit Requirements

Contractors who are qualified to furnish hydraulic knee mechanisms are required to provide a "loaner" unit in the event that a veteran beneficiary's unit needs repair by the manufacturer. Loaner is defined as a suitable prosthetic, fit for patient use during the repair period. The contractor shall submit a copy of the invoice from the manufacturer to support the cost of repairing the malfunctioning unit. Any salvage value granted by the manufacturer for a non-repairable unit shall be credited to VA against the cost of a replacement unit.

Microprocessor Knee Joints

Contractors who are qualified to furnish microprocessor knee joints are required to provide a "loaner" unit in the event that a veteran beneficiary's unit needs repair by the manufacturer. The contractor shall submit a copy of the invoice from the manufacturer to support the cost of repairing the malfunctioning unit. Any salvage value granted by the manufacturer for a non-repairable unit shall be credited to VA against the cost of a replacement unit. Some microprocessor knee joints may have up to a three-year warranty for parts from the manufacturer, which shall be credited to the VA.

Salvage

In the event that a veteran beneficiary dies prior to delivery and acceptance of an artificial limb, VA shall pay the contractor for the work performed up to the point that they are notified to stop work. The pricing paid shall be mutually agreed upon and shall not exceed the contract price of the limb less the salvage value of the unused limb.

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

December 19, 2006

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

REF: Contract Number V249-P-0011

Dear Mr. Kenney:

This letter is to notify you that I have been informed by Ms. Peggy Allawat, Prosthetic Manager, VAMC Lexington, that your company is not performing in accordance with certain sections of the contract. It has been noted that prescriptions are being altered and non-prescribed items are being provided without prior approval. Under the "General Requirements" the section of the contract for Standards of Performance states **"The Contractor shall fabricate all artificial limbs in strict conformance to the prosthetic prescription that has been provided by the VA Amputee Clinic Team. Contractors shall not add or substitute components or alter the beneficiary's limb prescription in any way without prior approval and written authority from the VA Amputee Clinic Team Prosthetic Representative or designee".**

This letter serves as notice that prescriptions **will not** be changed and you are not to inform the patient that you can provide a modification to the prescription unless prior authorization is given from VA Amputee Clinic Team Prosthetic Representative or designee". **This is also a reminder that fabrication should not begin until the prescription is provided by the VA.**

**There will be no reimbursement for non-prescribed items not authorized.** Issues concerning the reimbursement to vendors for prosthesis are between the VA and the vendor. Please refrain from discussing issues with patients that are of a contractual nature and that should be discussed with the Technical Representative, Ms. Peggy Allawat or the Contracting Officer, Ms. Yvette Harvey.

At this time you are not complying with the terms and conditions of the contract. Please provide a plan to this office no later than **December 29, 2006** which will specify your actions for correcting these deficiencies immediately. This plan should include any future actions that will eliminate this problem.

I can be reached on 615-867-5957 or by fax on 615-867-5429.

Yvette Harvey

YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
B

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE

Page of Page: 1 of 1

2. AMENDMENT/MODIFICATION NO.: Change Order No. a

3. EFFECTIVE DATE: 1/1/07

4. REQUISITION/PURCHASE REQ. NO.

5. PROJECT NO. (IF APPLICABLE)

6. ISSUED BY: CODE 626/90C

Contracting Officer (90C)
VA Tennessee Valley Healthcare System
3400 Lebanon Pike
Murfreesboro, TN 37129

7. ADMINISTERED BY (IF OTHER THAN ITEM 6) CODE

Same as Item 6.

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code)

KENNEY ORTHOPEDICS
449 LEWIS HARGETT CIRCLE
SUITE 110
LEXINGTON, KY 40503

ATTN: PAUL KATZMAN

CODE | FACILITY CODE

(✓) X

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

10A. MODIFICATION OF CONTRACT/ORDER NO.: VA-249-P-0011

10B. DATED (SEE ITEM 13): 8/21/06

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (IF REQUIRED)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

☐ A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

☐ B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (Such as changes in the paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

☐ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

☐ D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Beginning January 1, 2007, please issue the attached Patient Satisfaction Survey to all VA patients to be completed. A consolidated report of the results of these surveys must be sent to your COTR QUARTERLY. The first due date for this report will be March 31, 2007 and every quarter thereafter.

PLAINTIFF'S EXHIBIT C

All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. Name and Title of Signer (Type or print)

16A. Name and Title of Contracting Officer (Type or print)
YVETTE HARVEY 615-867-5957
Contracting Officer

15B. Contractor/Offeror

(Signature of person authorized to sign)

15C. Date Signed

16B. United States of America

BY Yvette Harvey
(Signature of Contracting Officer)

16C. Date Signed: 12/21/06

EXCEPTION TO SF30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

December 22, 2006

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Yvette Harvey, Contracting Officer
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT 2

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Harvey:

Please be advised that this firm represents Kenney Orthopedic, LLC. In response to your December 19, 2006 correspondence, please provide further information and documentation upon which Kenney Orthopedic may respond to the concerns raised therein. Kenney Orthopedic has researched its records and is unable to locate any instances where it has not been in compliance with the terms and conditions of the contract for Standards of Performance. Although you cite to the actual provisions of the contract, there is no identification of patients, services, or other identifying information that would allow for Kenney Orthopedic to research the specific instances in order to properly respond and provide a plan of action.

Accordingly, please consider this a formal request for documentation and identification of the areas in which Kenney Orthopedic has been identified as failing to comply with the terms and conditions of the contract, including identification of the services, patients, and circumstances giving rise to your concerns. Also, please consider this a request for further extension of the time frame within which Kenney Orthopedic is required to provide a plan of action, since Kenney Orthopedic is not able to adequately provide any such plan until the appropriate documentation is supplied and, in addition, the time period during

which this correspondence was received falls between Christmas and the New Year, which presents difficulty for the company in timely providing an adequate response.

Thank you for your prompt attention to this matter and if you have any further questions or need to discuss this matter further, please do not hesitate to contact me at the above-referenced telephone number and address.

Sincerely,

James M. Morris

JMM:be
Enclosure
cc: Mr. John M. Kenney

M:\LTR\Kenney.VA.wpd

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

January 8, 2007

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

REF: Contract Number V249-P-0011

Dear Mr. Kenney:

This letter is in response to a letter received from James M. Morris, Attorney, dated December 22, 2006 requesting specific information and details in reference to my letter of deficiency dated December 19, 2006. Below is the specific information that you have requested.

***Veteran was scheduled and seen in Amputee Clinic on Sep 20, 2006; note states veteran was not ready to be fitted for prosthetic limb.***
***Veteran was scheduled and seen in Amputee Clinic on Oct 18, 2006; no prescription was written forprosthetic limb.***
***Veteran was scheduled and seen in Amputee Clinic on Nov 1, 2006; prescription was written by VAProsthetic Team.***

The consult dated **November 1, 2006** requested:
Temporary prosthesis: PTB,
Suspension suction, silicon sleeve, pelite
liner, foot=energy storing (Seattle lite).
6 1-plys
3 5-ply
3 3-ply

Request for quote faxed on **November 3** to Kenney Orthopedic for:
Temporary LBK Prosthesis; PTB; Suspension Suction; Silicon Sleeve;
Pelite Linter, Energy Storing Foot (Seattle Lite); Stump Sock
6 Each of One Ply; Stump Socks Each of Five Ply; and Stump Socks
Three Each of Three Ply

***Kenney Orthopedic provided a quote on November 9, 2006 that included:***
***Preparatory PTB with additions of L5655 & L5668 were not prescribed/nor approved for payment. More socks/shrinkers/sheaths were provided than were prescribed, therefore we did not pay for more than were prescribed. Kenney's quote noted 12 of each sock/sheath – see above for number of socks prescribed. He did not follow the prescription from VA.***

***Please note that prosthesis was delivered to veteran on NOVEMBER 3, 2006 —– the quote had not been reviewed or approved by VA prior to the delivery of the prosthesis.***

PLAINTIFF'S EXHIBIT
6

**Clearly in this case of Williams5967: Kenney Orthopedic did not follow proper procedure nor did he follow the**
***VA prescription and he fabricated the prosthesis prior to VA approval of the quote.***

***During a conversation with Mr Kenney on Dec 20th, he admitted that he had casted/fit the veteran prior to receiving the RX. The veteran confirmed that fittings were done prior to Nov 1, 2006.***

Mr. Kenney we value the service you provide to our veterans. Therefore, we need to ensure that both parties are working in accordance to the contract.

**Please provide me with a plan for correcting these problems as well as any future actions that will eliminate this problem no later than January 22, 2007.**

I can be reached on 615-867-5957 or by fax on 615-867-5429.

Yvette Harvey

YVETTE HARVEY
Contracting Officer

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

January 22, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Yvette Harvey, Contracting Officer
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT F

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Harvey:

Please let this correspondence serve as our formal written response to the concerns raised in your correspondence dated January 8, 2007. This patient was initially seen in the offices of Kenney Orthopedics on September 8, 2006 for a consultation and evaluation. He was given prosthetic information and the amputation was properly documented. The patient was scheduled for an evaluation appointment on September 25, 2006. On that date, he had all but three stitches remaining and a high reduction in swelling so measurements for a prosthetic device were taken at that time. The patient was scheduled for an appointment on October 11, 2006, for a diagnostic static (non weight bearing) socket fitting. The patient was scheduled for another diagnostic socket fitting on October 19, 2006. The patient was fit and delivered with a prosthetic device on November 3, 2006. As a certified prosthetist, the basis for not providing a prosthesis until November 3, 2006 was due to the best interest of the

patient, and the need for waiting until such time as the limb was in proper condition, i.e., the suture wounds were completely healed. Under the Code of Ethical Conduct for Care for American Board of Certification for Certified Prosthetists, Mr. Kenney is mandated to assure proper care for this particular patient upon agreeing to provide services, which would include proper fitting of a prosthetic device at the appropriate time. Nonetheless, the prescription for this device was provided to Kenney Orthopedics ***on November 1, 2006***, and no prosthetic device was provided until November 3, 2006 – two days after the prescription was provided. The only "admission" made by Mr. Kenney, when inquired, was that he provided diagnostic sockets ***only*** prior to the prescription date. Thus, the prescription was, in fact, received two days prior to the delivery date, and the statements to the contrary in your January 8, 2007 correspondence are incorrect. In addition, as a Board Certified Prosthetist, upon receipt of the prescription for this device, Mr. Kenney is obligated to provide prompt service and care to the patient in meeting his medical needs.

The only other issue raised in your letter pertains to the prosthetic socks and the fact that Kenney Orthopedics provided twelve socks instead of six socks to this particular patient. In response, Kenney Orthopedics acknowledges that the number of socks provided to this particular patient was, according to the prescription, inaccurate. However, in further clarification, in direct response to the request for services, Kenney Orthopedics provided the usual and customary number of socks generally accepted by Medicare as appropriate and medically necessary for proper treatment of prosthetic patients. In providing these twelve socks, Kenney Orthopedics believed that it was providing appropriate and necessary care to the patient, although it acknowledges that, for whatever reason, the within prescription was limited to a number of socks that were less than the usual and customary number typically provided for Medicare patients. While this may technically be considered an "error," the nature of such socks, and the need for them by the patient, as well as the fact that the number of socks provided equals the usual and customary number approved by Medicare, we believe that such an error should not result in concern to the level expressed in your correspondence. However, in an effort to alleviate any concern that the VA may have, Kenney Orthopedics has already agreed not to seek payment for the additional socks provided, and has further undertaken to assure that the number of socks requested in the future are verified prior to requesting payment for same.

As demonstrated by the above explanation, Kenney Orthopedics continues to provide excellent care to veterans under the VA's care. We trust that the above explanation, and correction to the misstatements of fact contained in your January 8, 2007 correspondence, as well as the steps taken to assure no extra socks are provided without proper authorization, alleviate any misconceptions or concerns that you may have had regarding this isolated

incident. To the extent that further information is needed, however, please advise so that we can provide any additional information or assurances as necessary. Thank you for your prompt attention to this matter and if you have any further questions or need to discuss this matter further, please do not hesitate to contact me at the above-referenced telephone number and address.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney

M:\LTR\Kenney.VA2.wpd

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

February 27, 2007

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

REF: Contract Number V249-P-0011

Dear Mr. Kenney:

This letter is in response to your request for payment of an invoice in the amount of approximately $3900.00 for a prosthesis for Mr. Williams that was delivered to him on November 3, 2006. However on December 20, 2006, Mr. Williams had a new prescription from the VA for a replacement prosthesis.

In accordance with the contract under "Performance, Delivery, Inspection and Acceptance" **it states that the contractor warrants the artificial limb provided against defective material and/or workmanship for a minimum of 90 calendar days from the date of acceptance.**

According to the Prosthetic Department at VAMC Lexington if the original prosthetic socket had fit properly, Mr. Williams would not have been wearing 6-8 ply socks when the original prosthesis was delivered to him on November 3, 2006 he would have been wearing 0-3 ply socks and ultimately Mr. Williams would not have needed a new socket within 90 days from the original date of delivery.

Therefore, it has been determined that the claim for approximately $3,900.00 to Kenney Orthopedics will be denied based on negligence in providing an appropriately fitting prosthesis to Mr. Williams on November 3, 2006.

Furthermore, Mr. Kenney, I have been made aware of several instances where veteran's prescriptions have been altered without having prior approval and written authority from the VA Amputee Clinic Team Prosthetic Representative or designee. **Mr. Kenney this process will not be tolerated anymore. There will be no reimbursement for non-prescribed items not authorized and prescriptions written prior to VA approval of quote.**

We value the service that you provide to the Department of Veterans Affairs however all actions must be in accordance with the contract. **If you continue to perform outside of the scope of the contract I will be forced to start termination procedures. If the termination process is started unless the conditions are cured within 10 days after receipt of your next notice the Government may terminate for default under the terms and conditions of the Contract Terms and Conditions – Commercial Items clause of this contract.**

If you have any question concerning this matter I can be reached on 615-867-5957 or by fax on 615-867-5429.

Yvette Harvey

YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
G

# PRESCRIPTION POLICY FOR PROSTHESIS

February 28, 2007

In April 2006, each contract vendor was provided with a detailed process from VA in regards to prescribing and delivering prosthesis to our veterans.

To date, this process is not being followed in some instances. This follow up letter is to reiterate the process that must be followed to ensure our veterans are receiving the prescribed prosthesis and appropriate check out & acceptance by the VA.

The modification to the process must be followed effective immediately by all contract vendors working with our veterans.

- All temporary prosthesis will be provided by the VA.
- VA has the option to purchase prescribed components/etc for vendors use.
- Definitive prosthesis fabrication process should not begin until the VA has written the prescription for the prosthesis; the Request for Quote has been received and reviewed by the VA O&P Lab; the Purchase Order is provided to the contracted O&P vendor. The PO must not be billed until the Prosthesis is checked out in the Amputee Clinic at VA.
- Both the temporary and definitive prosthesis MUST be delivered to the veteran in the Amputee Clinic at the VA. If you are providing the definitive prosthesis, you will need to contact VA and schedule appt for the veteran in the Amputee Clinic. No prosthesis will be delivered to the veteran without being seen in Amputee Clinic at which time the prescription and prosthesis will be reviewed to ensure compliance with the prescription and that the prosthesis has a proper fit to the veteran. After the VA has approved the fabrication and fit of the prosthesis the PO may be billed.
- If the prescription requests a cover for the prosthesis, a cover will not be paid for or provided until after the prosthesis has been checked out in the Amputee Clinic.
- If any questions regarding the prescription or HCPCS codes, these questions must be brought to the attention of the VA Prosthetist.
- Contract and prescription MUST be followed.

- This same process of prescription review/approval is in effect for braces, shoes, inserts, etc as well as prosthesis. Veteran must have delivery and check out of all devices (braces, shoes, inserts, etc) in the Amputee Clinic. Veteran must bring all devices, For example, if a Veteran is prescribed 2 pair of inserts, he/she is to bring both pair for check out in clinic.

Peggy D. Allawat
Prosthetic Manager
(859)281-4871

YaVonne Money
Certified Prosthetist
(859)281-3923

PLAINTIFF'S EXHIBIT H

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

March 13, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Betty Benmark, Network Contracting Manager
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT I

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Benmark:

Thank you for discussing this matter with me via telephone on Friday, March 9, 2007. As I explained during that conversation, I am extremely concerned with the complete lack of response to my January 22, 2007 correspondence, that was intended to put to rest any of the purported concerns previously raised by Ms. Harvey with regard to this contract. We are also troubled by Ms. Harvey's February 27, 2007 correspondence which utilizes inappropriate, inflammatory, and blatantly false accusations and misrepresentations regarding Kenney Orthopedics, Inc., and the services that were provided to this particular patient. Please let this correspondence serve as our formal written response to the latest allegations contained in the February 27, 2007 letter, and also a demand for specific documentation supporting the serious allegations contained therein.

First, Ms. Harvey's assertion, in the initial paragraph, that Mr. Williams "had a new prescription from the VA for a replacement prosthesis," is grossly inaccurate. In actuality, on December 20, 2006, a prescription was written for a replacement ***socket***. A socket replacement is indicated to adjust to the expected atrophy of a new amputation. In this particular case, the patient demonstrated a significant amount of atrophy and shape change in a short amount of time, thus resulting in the need for a prescription for a replacement socket – not a replacement prosthesis as erroneously asserted by Ms. Harvey.

Ms. Betty Benmark, Network Contracting Manager
March 13, 2007
Page 2

Secondly, according to the American Board of Certification, the acceptable amount of sock ply is between 0 - 6 ply. On the November 3, 2006 date of delivery of the prosthesis, Mr. Williams was at a 3 ply fit, well within the generally accepted ply range. Therefore, the allegation of negligence is completely unfounded and we demand retraction of that statement immediately.

Next, Ms. Harvey erroneously states that "Mr. Williams would not have needed a new socket within 90 days from the original date of delivery." It is impossible to predict how fast and what amount an amputee's residual limb will atrophy. In the case of Mr. Williams, the rate of atrophy and anatomical change was faster than for an average patient. As you should be well aware, the section of the contract that Ms. Harvey quoted in her correspondence, stating "the contractor warrants the artificial limbs provided against defective material and/or workmanship for the minimum of 90 calendar days from the date of acceptance," goes on to state that "these conditions do not apply to [] ***adjustments due to physical change of the wearer***..." We have provided unequivocal evidence of the fact that the December 20, 2006 prescription for a change in the socket (and not the prosthesis as improperly alleged by Ms. Harvey) was due to an anatomical change in the patient. Thus, the allegations pertaining thereto are improper, contrary to the facts of the within matter, and require immediate retraction by the VA.

As a point in fact, in direct contradiction to Ms. Harvey's assertions, in the past two weeks, Mr. Williams has, once again, been prescribed for a socket change ***due to the ongoing anatomical changes*** in his amputated limb. There is simply no justification for continuing to erroneously accuse Kenney Orthopedics of negligence when the evidence clearly demonstrates that this patient, and numerous other patients under the care of the VA, experience anatomical changes necessitating socket changes on a routine basis. This renewed prescription underscores the lack of basis for Ms. Harvey's accusations pertaining to the December 20, 2006 replacement socket.

The difficulty presented by this particular situation, however, is complicated by the fact that the VA has failed to promptly compensate Kenney Orthopedics upon delivery of the new socket. This conduct is impairing the ongoing treatment of this particular patient, inasmuch as Kenney Orthopedics is unable to provide for services without assurances that it will be reimbursed for the services provided. The VA must immediately address this situation so as cease interfering with the ongoing necessary medical treatment of this particular patient and numerous others in similar situations.

Next, Ms. Harvey carelessly casts out allegations regarding "several instances" of prescription alteration by Kenney Orthopedics. As explained in our previous

correspondence, we are only aware of one isolated incident where the usual and customary 12 socks were provided instead of the 6 socks prescribed on that isolated incident. If you are aware of additional instances, please immediately identify all such instances and provide supporting documentation so that the situation can be assessed and addressed promptly. If you know of no other "instances," a written retraction is warranted and demanded.

Finally, Mr. Kenney has been providing excellent service to his patients at the VA for over twelve years, and has never experienced any difficulties, nor been accused of providing any services that were even slightly inappropriate – much less "negligent." The serious nature of the allegations made against Mr. Kenney and his organization in your February 27, 2007 correspondence necessitate an immediate investigation and response, including all documentation upon which Ms. Harvey is relying in making such allegations, so as to allow Kenney Orthopedics to adequately defend against the ever-changing assertions and allegations made by Ms. Harvey in her two most recent letters.

As demonstrated by the above explanation, Kenney Orthopedics continues to provide excellent services to veterans under the VA's care. We trust that the above explanation, and correction to the multiple misstatements of fact contained in Ms. Harvey's January 8, 2007 and February 27, 2007 correspondence, sufficiently alleviate any misconceptions or concerns that she may have had regarding this contract. Again, as stated in my previous correspondence, to the extent that further information is needed, or to the extent that Ms. Harvey makes additional assertions not previously documented, please advise promptly so that we can address such allegations, rather than learning of such a changed position via a letter such as the February 27, 2007 correspondence.

Finally, Kenney Orthopedics renews its demand for immediate payment for the delivery of services pertaining to this particular patient so that the VA does not continue to impede the prompt and proper treatment of its patients currently under contract to Kenney Orthopedics. Thank you for your prompt attention to this matter and if you have any further questions or need to discuss this matter further, please do not hesitate to contact me at the above-referenced telephone number and address.

Sincerely,

James M. Morris

JMM:bc

cc: Mr. John M. Kenney

M:\LTR\Kenney VA 3.wpd

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

March 14, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Betty Benmark, Network Contracting Manager
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT J

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Benmark:

Kenney Orthopedics, Inc. has now received requests for socket replacements or prostheses for three additional VA patients due to anatomical changes associated with atrophy in the amputated limb. Obviously, given the difficulties associated with the other socket replacement, and the VA's continuing refusal to abide by the contract for services, Kenney Orthopedics is extremely concerned about performing its duties under its obligations to those other three patients while there is a distinct possibility that the VA will, again, fail to comprehend the necessary medical treatment of its patients and will, once again, refuse to reimburse Kenney Orthopedics for services that have been rendered to its patients in accordance with necessary medical treatment.

Accordingly, please provide proper assurances immediately that the VA will not continue to intentionally interfere with the necessary ongoing medical treatment of Kenney Orthopedics patients, and that Kenney Orthopedics can expect appropriate payment for services rendered in accordance with the anatomical changes associated with these additional patients. If the VA is refusing to provide such assurances, and is intentionally interfering

with the ability of Kenney Orthopedics to perform under the terms and conditions of the contract for services, we will have no other alternative but to seek appropriate relief.

Obviously, given the fact that these additional replacement sockets and/or prostheses are a medical necessity for those patients, an immediate response is necessary so as to assure as little disruption in the medical treatment of those patients as possible. Accordingly, I look forward to hearing from you immediately on this pressing matter.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney
M:\LTR\Kenney.VA4.wpd

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

March 30, 2007

Morris & Morris P.S.C.
217 North Upper Street
P.O. Box 394
Lexington, KY 40588-0394

REF: Contract Number V249-P-0011

Dear Mr. Morris:

This letter is in response to your letter dated March 13 and 14, 2007:

Letter Dated March 13

1) Paragraph 1 – The purpose of Ms. Harvey's letter dated February 27, 2007 was to deny the claim in the amount of $3,952.40. Based on my fact finding this denial was supported in full. The replacement prosthesis should have been covered under the warranty period of 90 days. Your client proceeded with fitting the patient prior to receiving an executed purchase order from the VA Prosthetic Clinic. The procedures outlined for patient referrals is clearly stated in the Prescription Policy For Prosthesis dated April 2006 and revised on February 2007 which was provided to all contractors that received an award for these services (see attached).

2) Paragraph 2 – In respect to the initial invoice, records indicate Invoice #W71614 for the amount of $4,944.52 was paid. Records also indicate that the patient in question received the prosthesis prior to receiving a purchase order from the Lexington Prosthetic Office. The initial VA request for quote for such patient was provided to Mr. Kenney on November 3, 2006. Mr. Kenney's quote was received on November 9, 2006. The quote was approved by the Prosthetic Clinic and Purchase Number W71614 was issued on November 30, 2006. This is when the prosthesis should have been fabricated. However, the patient confirmed he actually received the device on November 3, 2006 at the contractor's facility. In accordance with the Prescription Policy, it specifically informs contractors that fabrication should not be initiated until authorized. The executed purchase order is the authorization. Furthermore, the VA in good faith paid for the initial prosthesis although the policy clearly states that any unauthorized components will not be paid for.

3) Paragraph 4 – Although agreed that patients vary in degree of atrophy change during the healing process, if the patient was seen by the VA after the initial fitting, the replacement socket the results may have been different. The Prescription Policy states that the contractor will request the veteran be scheduled in the VA Amputee Clinic for check out and delivery of the prosthesis. The patient was seen on December 15, 2006

PLAINTIFF'S EXHIBIT K

by the VA physician with a blister at the incision line; healing of stump complicated by delayed healing center incision. New problem of blister at incision resolved with no use of prosthesis. During the patient's assessment interview it was concluded that the fitting was not proper due to the improper sock size used for the initial prosthesis. During the VA Prosthetist interview with the patient it was confirmed that he was wearing 6 to 8 ply socks when he initially received his prosthesis. The VA Prosthetist recommended that the prosthesis be fitted with a TSB prosthesis with suction and pelite liner; with 0 PLY of socks to correct the problem. The VA Physician issued a prescription for a replacement socket on December 20, 2006 and the cause for the prescription change was the result of the improper fitting on November 3, 2006.

4) Paragraph 5 - Based on the patients follow up visits, additional changes have been in fact necessary. However, the changes were prescribed by the patient's VA physician and as a result we issued Purchase Orders W72649 for $279.77, W74295 for $273.75 and W74358 for $6,856.25. All of these invoices were approved and paid for in full. Therefore, these changes as prescribed by the VA physician were processed in accordance with the terms of the contract.

5) Paragraph 5 - I think that it is extremely important to point out that any patient referred by the VA to Mr. Kenney remains under the care of VA. During the fact finding process I discovered that Mr. Kenney is having our patients sign an additional Limited Liability Form. This is not required under the terms and conditions of the contract. The VA bears full financial responsibility for the services provided to the VA patient that have been referred.

Letter dated March 14:

1) Paragraph 1 – We acknowledge that additional patients have selected Kenney Orthopedic for their prosthesis. And until such time the contract expires or is terminated, any refusal to treat patients referred under this contract shall be construed as a failure to perform under the terms and conditions of this contract and Termination for Default procedures shall be taken. This contract was awarded for a base year with four option years to extend. The option year extensions are a unilateral right of the Government. The contractor does not have a bilateral right to terminate this contract.

2) Paragraph 2 - Under this contract, any patients referred to by the VA where the VA pays for the services rendered are considered VA patients. Therefore, we are not interfering with Mr. Kenney's patient care but on the contrary, it the VA patient care that is being compromised. In the future, if any incidents that occur under this contract that are perceived as violation of prescription change, I have instructed Ms. Harvey to immediately issue a Cure Notice. Under Government Contract Law, Mr. Kenney will be given a specific period of time to address the issue. The final decision of Ms. Harvey to deny the claim in the amount of $3,952.40 stands.

We value services provided by Kenney Orthopedics and want to make every effort to preserve what I believe can be a long term working relationship. The Lexington Medical Center has been pleased with the quality of work that he has provided in the past years and do not wish to sever that relationship. I do feel it is the best interest of both parties that I offer Mr. Kenney a face to face meeting to discuss the process in order to clarify the roles and responsibilities. This meeting will afford the opportunity to discuss the issues so further problems relating to order

processing are eliminated and the intent of the contract terms and conditions are preserved. If you are in agreement with this offer, Ms. Harvey, Ms. Aliawat, and myself will be more than happy to meet with Mr. Kenney.

If you have any questions concerning this matter I can be reached on 615-867-5913 or betty.benmark@va.gov, or by fax 615-867-5764.

Betty Benmark

BETTY C. BENMARK, CPCM
Network Contracting Manager

# PRESCRIPTION POLICY FOR PROSTHESIS
APRIL 2006

- New amputees will be prescribed shrinkers while an In-Patient at the VAMC. Non-Service Connected (NSC) veterans will have prosthesis provided by the VA. Service Connected (SC) veterans may select the local contract Prosthetic Lab or the VA Lab for fabrication of their prosthesis. A list of Prosthetic Labs and locations/phone numbers will be available for the veterans to make their selection.
- Normally veterans should wear temporary prosthesis until residual limb is well shaped and there are no signs of edema. VA will determine when the definitive prosthesis is needed. Veteran should be wearing 10-12 ply of socks unless otherwise determined by VA Rehab provider and VA Prosthetist prior to the definitive prosthesis being prescribed.
- Prosthetic prescriptions will solely be determined upon patients' medical history and current activity level; although the potential of a patient's activity level is important, each prescription will be written based upon realistic patient goals and potential. This includes, but not limited to, what type of socket design, suspension, knee, foot, etc the patient will receive.
- All prescribing practices will be in tune with Medicare guidelines and Fee Schedule in terms of components, activity level, and L-codes. Quotations need to be complete with L-codes, description and contract pricing.
- Request for quotation (ADP 10-90) will be prepared for the local contractors and will include a list of components prescribed by the VA. This quote will be faxed to the vendor; the vendor will evaluate the veteran and complete the quote. The quote can be faxed to the VA for review and concurrence by the Prosthetic Chief or designee for component, HCPCS, pricing accuracy in comparison with the prescription. Any suggested changes to the VA prescription must be approved in writing by the VA provider. The approved quote will be faxed to the vendor along with a Purchase Order. At that time, the vendor can initiate the fabrication of the prosthesis. The vendor should not initiate the fabrication until authorized. Any unapproved components will not be paid for by the VA.
- After the veteran is cast/fit with the prosthesis, the vendor will request the veteran be scheduled in the VA Amputee Clinic for check out and delivery of the prosthesis. Check out will include review of the original VA prescription and the components of the prosthesis provided to the veteran. Veteran will be requested to walk to ensure the prosthesis fits properly.
- Replacement prosthesis, sockets or other components must be approved by the VA prior to being provided by the contractor.

Peggy D. Allawat
Prosthetic Manager
(859)281-4871

YaVonne Money
Certified Prosthetist
(859)281-3923

PRESCRIPTION POLICY FOR PROSTHESIS
February 28, 2007

In April 2006, each contract vendor was provided with a detailed process from VA in regards to prescribing and delivering prosthesis to our veterans.

To date, this process is not being followed in some instances. This follow up letter is to reiterate the process that must be followed to ensure our veterans are receiving the prescribed prosthesis and appropriate check out & acceptance by the VA.

The modification to the process must be followed effective immediately by all contract vendors working with our veterans.

- All temporary prosthesis will be provided by the VA.
- VA has the option to purchase prescribed components/etc for vendors use.
- Definitive prosthesis fabrication process should not begin until the VA has written the prescription for the prosthesis; the Request for Quote has been received and reviewed by the VA O&P Lab; the Purchase Order is provided to the contracted O&P vendor. The PO must not be billed until the Prosthesis is checked out in the Amputee Clinic at VA.
- Both the temporary and definitive prosthesis MUST be delivered to the veteran in the Amputee Clinic at the VA. If you are providing the definitive prosthesis, you will need to contact VA and schedule appt for the veteran in the Amputee Clinic. No prosthesis will be delivered to the veteran without being seen in Amputee Clinic at which time the prescription and prosthesis will be reviewed to ensure compliance with the prescription and that the prosthesis has a proper fit to the veteran. After the VA has approved the fabrication and fit of the prosthesis the PO may be billed.
- If the prescription requests a cover for the prosthesis, a cover will not be paid for or provided until after the prosthesis has been checked out in the Amputee Clinic.
- If any questions regarding the prescription or HCPCS codes, these questions must be brought to the attention of the VA Prosthetist.
- Contract and prescription MUST be followed.

- This same process of prescription review/approval is in effect for braces, shoes, inserts, etc as well as prosthesis. Veteran must have delivery and check out of all devices (braces, shoes, inserts, etc) in the Amputee Clinic. Veteran must bring all devices, For example, if a Veteran is prescribed 2 pair of inserts, he/she is to bring both pair for check out in clinic.

Peggy D. Allawat
Prosthetic Manager
(859)281-4871

YaVonne Money
Certified Prosthetist
(859)281-3923

Date: April 19, 2007

To: Contract Prosthetic/Orthotic Vendors

Subj: Patient Satisfaction Survey Amendment

From: Peggy D. Allawat, COTR

Our current Orthotic and Prosthetic contracts were amended to include a Patient Satisfaction Survey to be effective on January 1, 2007. Survey questions were provided to you for use in this survey. A consolidated report of the results were to be sent to me with the first due date being March 31, 2007. If you are receiving this letter, I have not received the results per the Amendment.

On April 11, 2007, I faxed each of you a copy of the amendment and the survey questions. To date, I have not received your consolidated report.

Request your consolidated report be provided no later than April 30, 2007.

Peggy D. Allawat

Peggy D. Allawat
Prosthetic Manager
Lexington VAMC
(859)281-4871

PLAINTIFF'S EXHIBIT
L

Peggy Allawat
Veterans Administration
1101 Veterans Dr.
Lexington, Ky. 40502

April 19, 2007

RE: Patient Satisfaction Survey

Peggy,

We received the request to amend our Prosthetic contract on December 21, 2006. Our current contract was signed and agreed to by Yvette Harvey, Contracting Officer, August 15, 2006. The contract we signed did not include the Patient Satisfaction Survey; therefore, if the VA desires to change the terms of the contract, both parties must agree to the change. In the contract under "Part II-Contract Terms and Conditions, Section C, states "**Changes in the terms and conditions of this contract may be made in writing only by written agreement of the parties**".

Kenney Orthopedics did not and does not agree to the addition of the Patient Satisfaction Survey Amendment to our contract.

Sincerely,

Paul Katzman
Business Office Manager

PLAINTIFF'S
EXHIBIT
M

## PART II - CONTRACT TERMS AND CONDITIONS

### 52.212-4 CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (SEP 2005)

(a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) Assignment. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (e.g., use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) Definitions. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies(or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include--

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, contract line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

Peggy Allawat
Veterans Administration
1101 Veterans Dr.
Lexington, Ky. 40502

April 19, 2007

RE: Patient Satisfaction Survey

Peggy,

We received the request to amend our Prosthetic contract on December 21, 2006. Our current contract was signed and agreed to by Yvette Harvey, Contracting Officer, August 15, 2006. The contract we signed did not include the Patient Satisfaction Survey; therefore, if the VA desires to change the terms of the contract, both parties must agree to the change. In the contract under "Part II-Contract Terms and Conditions, Section C, states "**Changes in the terms and conditions of this contract may be made in writing only by written agreement of the parties**".

Kenney Orthopedics did not and does not agree to the addition of the Patient Satisfaction Survey Amendment to our contract.

Sincerely,

Paul Katzman
Business Office Manager

PLAINTIFF'S
EXHIBIT
M

## PART II - CONTRACT TERMS AND CONDITIONS

### 52.212-4 CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (SEP 2005)

(a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Government must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

(b) Assignment. The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727). However, when a third party makes payment (e.g., use of the Governmentwide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

(c) Changes. Changes in the terms and conditions of this contract may be made only by written agreement of the parties.

(d) Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(e) Definitions. The clause at FAR 52.202-1, Definitions, is incorporated herein by reference.

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(g) Invoice.

(1) The Contractor shall submit an original invoice and three copies(or electronic invoice, if authorized) to the address designated in the contract to receive invoices. An invoice must include--

(i) Name and address of the Contractor;

(ii) Invoice date and number;

(iii) Contract number, contract line item number and, if applicable, the order number;

(iv) Description, quantity, unit of measure, unit price and extended price of the items delivered;

(v) Shipping number and date of shipment, including the bill of lading number and weight of shipment if shipped on Government bill of lading;

(vi) Terms of any discount for prompt payment offered;

(vii) Name and address of official to whom payment is to be sent;

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

April 23, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Peggy D. Allawat
Prosthetic Manager
Veterans Administration
1101 Veterans Drive
Lexington, Kentucky 40502

PLAINTIFF'S EXHIBIT N

Re: Patient Satisfaction Survey

Dear Ms. Allawat:

Please provide a copy of the signed Amendment to the Kenney Orthopedic service contract, as referenced in your April 19, 2007 correspondence. We are unaware of any properly executed Amended Prosthetic Contract for Services. While Kenney Orthopedic acknowledges that a request was made for amendment, there was, to our knowledge, no agreement by Kenney Orthopedic to modify the previous agreement.

The August 15, 2006 contract, signed and agreed to by Ms. Yvette Harvey, Contracting Officer, does not include any provision for a Patient Satisfaction Survey. Kenney Orthopedic remains committed to continuing its excellent service and patient care, and has undertaken extraordinary measures to assure that its patients' needs are being satisfactorily met. However, a unilateral modification to the services contract mandating a quarterly report, along with the added expense and administration of providing such a quarterly report of patient satisfaction, was never agreed upon, nor negotiated between the parties.

sent via e-mail

As you are undoubtedly aware, the parties' agreement states that "[c]hanges in the terms and conditions of this contract may be made in writing only by written agreement of the parties." Unless such a written modification exists, there is no provision under the current contract for any such quarterly report. If the VA would like to negotiate the preparation of such a report, and provide for payments to Kenney Orthopedic for its expenditures related thereto, and if the terms and conditions of such a provision are acceptable to Kenney Orthopedic, perhaps we could arrange for a quarterly report to be prepared and provided upon request. Please advise as to whether you would like to provide such payments to Kenney Orthopedic in exchange for issuance of such reports.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney
M:\LTR\Kenney.VA7.wpd

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

April 23, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Betty Benmark, Network Contracting Manager
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT O

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Benmark:

I am extremely disappointed in the tone of your March 30, 2007 correspondence – especially considering your prior conciliatory tone and statements regarding a "misunderstanding" or confusion regarding the previous inappropriate comments that were made regarding this unfortunate incident. While I am not normally in the business of stating the obvious, let me reiterate the flaws in your analysis of this serious issue. For sake of clarity, I will, once again, address the issues in the order presented in your letter:

1. The denial of the proper billing claim submitted by KO for $3,952.40. Again, your correspondence demonstrates a complete lack of comprehension regarding the issue. The order was for a replacement ***socket***, not a replacement prosthesis. Thus, your entire premise is based upon a false assumption, inasmuch as there was no "replacement prosthesis," and the need for a replacement ***socket*** was necessary due to the anatomical changes in the patient due to atrophy. A socket replacement is required to adjust to the expected atrophy of a new amputation. In this particular case, the patient demonstrated a significant amount of atrophy and shape change in a short amount of time, thus resulting in the need for a prescription for a replacement socket – not a replacement prosthesis as

erroneously asserted by Ms. Harvey. On the November 3, 2006 date of delivery of the prosthesis, Mr. Williams was at a 3 ply fit, well within the generally accepted ply range. Therefore, your original allegation of negligence is completely unfounded, as is the regurgitation of that same allegation, once again, in your March 30, 2007 correspondence. Accordingly, as set forth hereinbelow, we look forward to receiving ***complete*** documentation to support this defamatory statement regarding KO's treatment of this particular patient.

As I have repeatedly attempted to explain, in the case of Mr. Williams, the rate of atrophy and anatomical change was faster than for an average patient. As you should be well aware, the section of the contract that Ms. Harvey quoted in her correspondence, stating "the contractor warrants the artificial limbs provided against defective material and/or workmanship for the minimum of 90 calendar days from the date of acceptance," goes on to state that "these conditions do not apply to [] ***adjustments due to physical change of the wearer***..." We have provided unequivocal evidence of the fact that the December 20, 2006 prescription for a change in the socket (and not the prosthesis as improperly alleged by Ms. Harvey) was due to an anatomical change in the patient. There is simply no justification for continuing to accuse Kenney Orthopedics of negligence when the evidence clearly demonstrates that this patient, and numerous other patients under the care of the VA, experience anatomical changes necessitating socket changes on a routine basis. Your correspondence fails, entirely, to address this provision of the parties' contractual agreement, and fails to identify upon what basis you are relying in asserting that the anatomical changes were not a direct result of atrophy. Accordingly, as set forth hereinbelow, we look forward to receiving ***complete*** documentation to support your unfounded assertion that the treatment of this patient was somehow improper.

2. Services provided. Your correspondence next addresses the fabrication of a device for this particular patient. Since it is clear that you do not have complete information pertaining to this particular situation, I provide the following synopsis for your edification: This patient was initially seen in the offices of Kenney Orthopedics on September 8, 2006 for a consultation and evaluation. He was given prosthetic information and the amputation was properly documented. The patient was scheduled for an evaluation appointment on September 25, 2006. On that date, he had all but three stitches remaining and a high reduction in swelling so measurements for a prosthetic device were taken at that time. The patient was scheduled for an appointment on October 11, 2006, for a diagnostic static (non weight bearing) socket fitting. The patient was scheduled for another diagnostic socket fitting on October 19, 2006. The patient was fit and delivered with a prosthetic device on November 3, 2006. As a certified prosthetist, the basis for not providing a prosthesis until November 3, 2006 was due to the best interest of the patient, and the need for waiting until

such time as the limb was in proper condition, i.e., the suture wounds were completely healed. ***Under the Code of Ethical Conduct for Care for American Board of Certification for Certified Prosthetists, Mr. Kenney is mandated to assure proper care for this particular patient upon agreeing to provide services, which would include proper fitting of a prosthetic device at the appropriate time***. Nonetheless, contrary to your assertions, the prescription for this device (i.e., the document which mandates that KO provide the services to the patient that he is ethically obligated to provide) was given to Kenney Orthopedics ***on November 1, 2006***, and no prosthetic device was provided until November 3, 2006 – two days after the prescription was provided. Thus, there was no impropriety pertaining to the delivery of a device, in accordance with the patient's medical care provider, in a prompt and reasonable manner. In fact, it is incredible that you, on behalf of the Federal Government, would challenge a provider providing prompt and appropriate services to one of ***your*** patients! To the extent that you are demanding that Mr. Kenney's organization violate his ethical obligations as a Certified Prosthetist, the terms and conditions of your "agreement" would be null and void, under Federal law, for attempting to force a medical care provider to neglect his ethical obligations to his ***patient*** upon receipt of a valid prescription for the device. If that is your position, I look forward to such an admission – especially in light of the recent publicity regarding the VA's ongoing lack of professionalism, medical care, and service to our military Veterans.

As to your admission that you failed to provide any approval for the medically-prescribed device, is your letter also an admission by the Federal government that it neglected to act upon a prescription issued on November 1, 2006 for ***thirty*** days?! If so, what possible explanation do you have for the government's failure to provide the proper approval for the medical necessity that was prescribed on November 1? Such a delay, in the face of a medical necessity, is inexcusable and constitutes an improper interference with KO's ability to perform under the terms and conditions of the contractual agreement giving rise to the services provided herein. As set forth hereinbelow, I look forward to receiving all supporting documentation for the inordinate delay and negligence on the part of the Federal government in delaying approval for medical services for this particular patient.

3. Atrophy. Under the section of the agreement between these parties, in the fourth paragraph, entitled "performance, delivery, inspection and acceptance", it states that "these conditions do not apply to ***adjustments incidental to the wearing of the prosthesis, adjustments required by the physical change of the wearer, or where there is evidence of deliberate misuse or alteration by anyone other than the contractor.*** All evidence clearly shows this is a case of anatomical change. Kenney Orthopedics has a directive to provide prosthetic care as soon as possible. This directive begins as soon as an order is mandated by the physician. We are required by "the professional code of responsibility", to abide by these rules. Your letter improperly relies upon an evaluation that was not provided by the VA until

***six weeks following the delivery of the prosthesis***. If you have documentation or information that is more directly tied to the November 3, 2006 delivery date, please provide the same. Otherwise, your assertions regarding an "improper fit" are based upon an utter lack of information and are completely without basis. It is not uncommon for a patient to atrophy to a 6-8 ply fit in six weeks after his initial fitting. In fact, there have been numerous studies pertaining thereto, including *Zachariah, Saxena, Fergason,* and *Sanders*, "Shape and volume change in the transtibial residuum over the short term: Preliminary investigation of six subjects," Journal of Rehabilitation Research & Development, Vol. 41, No. 5, Sept/Oct. 2004. As set forth in the abstract to that publication, "multiple mechanisms of fluid movement may be responsible for short-term volume changes, with different relative magnitudes and rates in different amputees." KO has provided documentation of the fact that this patient was a 3 ply fit at delivery, to which the patient has already attested, and which we intend to utilize to remedy the situation in the event that the improper allegations are not immediately retracted and this matter is properly addressed.

4. Payment. While we appreciate that the government is providing payment for certain services rendered under the terms and conditions of the parties' agreement, we are extremely concerned about the intentional interference with KO's ability to provide ongoing services to its patients – especially in light of the government's acknowledgment that it has engaged in inordinate delays in approving medically-prescribed services.

5. Patient care. Your correspondence raises questions about a Limited Liability Form that is mandated ***by the Federal Government*** through the Medicare program. I trust that you, as the federal government, understand the fact that medical care providers are mandated to adhere to each federal agency's requirements. The fact that you are attempting to harass this individual provider regarding his compliance with federal mandates is of deep concern, and demonstrates a complete and utter lack of understanding and/or an intentional effort to undermine KO's ability to provide proper services. Either way, the lack of basis for your position is extremely telling.

March 14 response:

1. Your correspondence improperly attempts to twist my previous concerns. It is the government's actions, through your agency, that are undermining the ability to provide services to these patients, and is resulting in an intentional interference with Mr. Kenney's ability to perform under the terms and conditions of that contractual agreement. The lack of prompt and timely approval of medically-prescribed devices, failure to promptly remit payment for services, improper efforts to manipulate the bases for services rendered, etc. Please do not attempt to manipulate my correspondence to claim that KO is not providing adequate services to its patients.

2. Again, you make bold assertions regarding KO's treatment of patients, even going so far as to state that "it the [sic] VA patient care that is being compromised," but you fail to provide a single shred of evidence to support your baseless position.

I encourage you to carefully review the entire file, and your previous assertions concerning KO, inasmuch as those claims and assertions are extremely serious charges that have been placed into the public by virtue of the various letters herein, and will be dealt with in an appropriate fashion to the extent that we are not able to resolve the improprieties that have taken place.

Finally, pursuant to the FOIA, please consider this a formal demand for any and all documents upon which the government has relied in making the assertions contained in the correspondence sent to Kenney Orthopedic and to the undersigned pertaining to the patient at issue herein, including, but not limited to, medical records, correspondence, e-mail, and other similar documentation. To the extent that this demand needs to be forwarded to a different department, please advise, immediately, so that the request for information can be forwarded promptly and the underlying documentation obtained in accordance with the express provisions of FOIA.

I look forward to hearing from you promptly on this serious matter pertaining to the government's actions herein, including, specifically, the failure to provide prompt approvals for medically-prescribed devices as acknowledged in your previous correspondence.

Sincerely,

James M. Morris

JMM:be

cc: Mr. John M. Kenney

M:\LTR\Kenney.VA6.wpd

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

July 2, 2007

Kenney Orthopedics
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

ATTN: Mr. Kenney

Reference is made to Contract VA249-P-0011 for providing Artificial Limb Services to the VAMC Lexington.

As specified in FAR 52.217-09, Option to Extend the Term of the Contract, this is your preliminary notice of the intent to extend the above subject contract. This preliminary notice does not commit the Government to an extension. However, if extended, you will receive SF Form 30, Modification of Contract, which will specify the dates for the new option year.

Questions may be directed to Ms. Yvette Harvey on 615-867-5957.

Yvette Harvey

YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
P

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE | Page of Page 1 of 1

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (IF APPLICABLE) |
|---|---|---|---|
| Change Order No. a | 8/21/07 | | |

| 6. ISSUED BY: 626/90C | 7. ADMINISTERED BY (IF OTHER THAN ITEM 6) CODE |
|---|---|
| Contracting Officer (90C)<br>VA Tennessee Valley Healthcare System<br>3400 Lebanon Pike<br>Murfreesboro, TN 37129 | Same as Item 6. |

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code)

KENNEY ORTHOPEDICS
449 LEWIS HARGETT CIRCLE
SUITE 110
LEXINGTON, KY 40503

ATTN: MR. KENNEY

CODE | FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.
VA249-P-0011

10B. DATED (SEE ITEM 13)
8/21/06

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (IF REQUIRED)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

☐ A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

☐ B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (Such as changes in the paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

☒ C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR Clause 52.217-9, Option to Extend The Term of the Contract

☐ D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Contract VA249-P-0011 has hereby been modified:

The Government hereby exercises option year one for VAMC Lexington. The period of performance is August 21, 2007 through August 20, 2008.

All other terms and conditions remain the same.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. Name and Title of Signer (Type or print) | | 16A. Name and Title of Contracting Officer (Type or print) | |
|---|---|---|---|
| | | YVETTE HARVEY 615-867-5957<br>Contracting Officer | |
| 15B. Contractor/Offeror<br><br>(Signature of person authorized to sign) | 15C. Date Signed | 16B. United States of America<br>BY Yvette Harvey<br>(Signature of Contracting Officer) | 16C. Date Signed<br>9/5/07 |

EXCEPTION TO SF30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

July 18, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Betty Benmark, Network Contracting Manager
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT Q

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Benmark:

I have received and reviewed the redacted documentation that you have claimed "support" the government's position with regard to the above-referenced contract, and the defamatory statements made about Kenney Orthopedics by your local official. Now that we have obtained complete medical records and documentation from the patient, as well as a sworn statement, unequivocally disproving your inappropriate and unsupported allegations of negligence and misconduct, I call upon your organization, once again, to retract the statements that were made and to issue a formal apology for the gross misstatements and improper allegations.

Quite frankly, given the sworn statement received by the patient which directly contradicts the government's position vis-a-vis the patient's condition at the time of fitting, and the circumstances leading up to the fitting, I have advised Mr. Kenney that I believe that the actions arise to a level that he should be compensated for the gross lack of competence in making such improper allegations regarding his professional endeavors. Nonetheless, he has asked that I demand, one last time, that the government either provide a proper explanation or retract the factually inaccurate statements made regarding the treatment of the

subject patient, and that the compensation due Kenney Orthopedics be forward immediately. I look forward to hearing from you promptly on this serious matter pertaining to the government's actions herein, including, specifically, the failure to provide prompt approvals for medically-prescribed devices as acknowledged in your previous correspondence and which was never addressed by you subsequent thereto.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney
M:\LTR\Kenney.VA8.wpd

**DEPARTMENT OF VETERANS AFFAIRS**
**Acquisition Service Center VISN 9**
**VA Tennessee Valley Healthcare System**
**Alvin C. York Campus**
**3400 Lebanon Pike**
**Murfreesboro, TN 37129**

August 29, 2007

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

SUBJECT: Cure Notice Contract Number V249-P-0011

Dear Mr. Kenney:

You are notified that the Government considers your failure to comply with the ordering requirements required in your contract a condition that is endangering performance of the contract. Therefore, unless this condition is cured as described below within 10 days after receipt of this notice the Government may terminate for default under the terms and conditions of the Federal Acquisition Regulation 52.212-4 (m) Termination for Cause clause of this contract.

There appears to be a chronic problem evidenced in your previous actions and duly noted in correspondence from our office dated 30 March 2007. You failed to obtain a purchase order, which is required by the contract, authorizing you to proceed with fittings and fabrication of prosthetic devices as prescribed by a VA physician. We pointed out the procedures required for patient "referral" that clearly states the Prescription Policy for Prosthesis (dated February 2007). Your explanation does not excuse the blatant and willful violation of the contract terms that you have agreed to by signature of the contract. This recent event, where you again have failed to wait for a Request for Quote and Purchase Order and proceeded with fabrication of a device that was not the prescribed product (Thermolyn), clearly demonstrates your unwillingness to adhere to the terms and condition of the contract and you indifference to seeking approval. Your continuing to prescribe or alter VA prescriptions is a violation of the contract and must be stopped immediately. Your failure to do so has placed our veterans care at high risk.

9-7-07

As a consequence, we require that you prepare a signed statement attesting to your commitment to comply with the terms and conditions of the contract, and to submit it no later than ten (10) days from receipt of this notice. During this period, we will regard any failure to perform services in full compliance of the contract as grounds for termination for cause of the contract.

Yvette Harvey

YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
R

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

September 14, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Yvette Harvey, Contracting Officer
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT S

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Harvey:

Please let this correspondence serve as our formal written response to the concerns raised in your most recent correspondence dated August 29, 2007. First and foremost, Kenney Orthopedics expresses grave concern over the repeated failure of the VA to provide proper care and treatment of its patients, including, specifically, the patient in question in this situation. As set forth in our July 20, 2007 correspondence, you, personally, as well as the VA, by and through your malicious actions, have engaged in repeated actions designed to defame and besmirch Kenney Orthopedics. We have documentation from this patient regarding the fact that those statements are grossly improper, inaccurate, and are designed to attempt to impugn Kenney Orthopedics' reputation. We demand an immediate response to the concerns raised in that letter as well as the additional concerns raised herein.

In addition, given the fact that you are bent on attempting to retaliate against Kenney Orthopedics with making additionally false, misleading, and intentionally defamatory statements regarding Kenney Orthopedics, we demand, ***immediately***, that you be removed from decision-making processes involving Kenney Orthopedics, and that an independent party be brought in to investigate your ongoing wrongdoing in this particular instance. Since we have documentation of the false statements contained in previous correspondence regarding Kenney Orthopedics, we will have no other alternative but to seek redress against you, personally, and the VA, for the wrongs that have been committed thus far vis-a-vis Kenney Orthopedics if we do not receive any response to our ongoing concerns.

With regard to the latest defamatory statements regarding Kenney Orthopedics, please be advised as follows:

First, Kenney Orthopedics strongly rejects your assertions regarding the manner in which this particular patient was treated by Kenney Orthopedics, and request that you first investigate the background of the situation prior to making such bald allegations against this company. Your failure to comprehend the circumstances surrounding the treatment of this patient is evident by the contents of your correspondence. First, you make reference to a "Prescription Policy for Prosthetics," and threaten Kenney Orthopedics by asserting that its actions are somehow in violation of the contract for services. Please be advised that the local The "policy" to which you make reference is a ***local*** VA policy and has ***no*** bearing upon the signed contract between the VA and Kenney Orthopedics. Secondly, please be advised that the local "policy" states only that "***definitive*** prosthetic fabrication progress ***should*** not be given until the VA has written the prescription for the prosthesis..." [Emphasis added.] It is not mandatory.

As you may not be aware, given your lack of knowledge of prosthetic and orthotic treatment and care of patients, there is a substantial difference between providing preliminary diagnostic fittings of prosthetic devices and providing a definitive prosthetic fabrication. In this case, and in accordance with its ethical responsibilities to the patient, Kenney Orthopedics provided preliminary diagnostic fittings upon receipt of a valid prescription for the prosthetic device. To act otherwise, and refuse to provide any services to the patient, would, in fact, have placed "our [V]eterans['] care at high risk." Nonetheless, inasmuch as no ***definitive*** prosthetic fabrication was delivered to this patient prior to a prescription being received, Kenney Orthopedics actions were, in no way, shape, or form, in violation of the express provisions of even that local "policy." Secondly, and more importantly, you may wish to review the express terms of that policy again and, if you have problems with the language utilized therein, request modification. The use of the word "should" does

***not*** mandate that the ***final*** product not be delivered prior to approval; instead, the VA's local entity elected to utilize the suggestive word "should," instead of "shall." Before you accuse a practitioner that it has engaged in actions that have "placed our veterans [sic] care at high risk," you "should" check the underlying language of the "policy" upon which you rely. To act otherwise is clearly negligent, without basis, and contrary to the express terms and conditions of the parties' contractual agreement.

We note, as well, that your correspondence fails to acknowledge the fact that the VA's own patient notes reflect the fact that the VA was fully aware that diagnostic fittings were being done for this patient. If, at any time, the VA believed that this "should" not be done, it certainly had every opportunity to notify Kenney Orthopedics of the fact that it had concerns about the ongoing treatment of this patient. The fact that no such concerns were raised belies your self-professed concerns regarding the care provided to our Veterans.

Next, your bald assertion regarding Kenney Orthopedics's failure to provide a "prescribed product (Thermolyn)," is directly refuted by the actual Request for Quote that was received by Kenney Orthopedics as well as the prescription agreed upon by the VA Physician. As reflected thereon, the prescription was for an ***Acrylic*** socket. Kenney Orthopedics has never delivered ***any*** prosthetic device that was not exactly what was prescribed for the specific patient. Any modifications to devices made to better suit a particular Veteran's care are only made after those items are expressly agreed upon by VA representatives. Accordingly, your assertions regarding this situation are grossly inaccurate, contrary to the underlying facts, and must be retracted immediately so as to reduce any ongoing harm to Kenney Orthopedics as a result of the false accusations.

Finally, your correspondence makes a baseless assertion that Kenney Orthopedics "has placed our veterans [sic] care at high risk." This statement is (1) completely unsupported in the record, (2) highly inflammatory, (3) serves absolutely no legitimate purpose, (4) violates the express terms and conditions of the parties' contractual agreement, and (5) is designed solely to retaliate against Kenney Orthopedics for having reported your ongoing antics and improprieties regarding the treatment of these Veterans. Kenney Orthopedics has always followed the high standards established by the ABC Code of Professional Responsibility with every patient, including the VA. Allegations to the contrary are utterly without merit and must be retracted immediately so as to be in compliance with the ABC and the VA contract under which Kenney Orthopedics provides services to these Veterans.

Given the extremely serious nature of these allegations, an immediate response from an independent party is demanded, along with any and all documentation that supports the

serious claims that you throw out in your August 29, 2007 correspondence. We will look for the VA's response to this matter within ten (10) days of receipt, as set forth in your correspondence.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney

M:\LTR\Kenney.VA9.wpd

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

September 18, 2007

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

SUBJECT: Contract Number V249-P-0011

Dear Mr. Kenney:

In reference to my letter dated August 29, 2007 this is a notification that you failed to respond to my request for a signed statement attesting to your commitment to comply with the terms and conditions of the contract.

To substantiate, several letters have been sent to you previously notifying you that the Government considers your failure to comply with the ordering requirements required in your contract a condition that is endangering performance of the contract and **will not** be tolerated.

You have received adequate written documentation detailing specific instances where you have failed to wait for a Request for Quote and Purchase Order from the VA before fabricating a device that was not prescribed.

Please be assured that we take this issue seriously and know that you have been given every opportunity to correct this situation. However, if we do not receive your response to our previous letter dated August 29, 2007 before close of business on **October 2, 2007** the Government may conclude that you choose not to cure your deficiency and may exercise its right to terminate for default under the terms and conditions of the Federal Acquisition Regulation 52.212-4 (m) Termination for Cause clause of this contract.

Yvette Harvey
YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
7

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

September 24, 2007

<u>SENT VIA FACSIMILE AND U.S. MAIL</u>

Ms. Yvette Harvey, Contracting Officer
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT
U

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Harvey:

We are in receipt of your September 18, 2007 correspondence pertaining to the above-referenced Contract. First of all, contrary to your comments, Kenney Orthopedics, Inc. responded to your earlier correspondence by letter dated September 14, 2007. A copy is enclosed in case you have lost the original.

Your most recent threat demands that Kenney Orthopedic "attest[] to [its] commitment to comply with the terms and conditions of the contract." For such attestation, please review the contract. By its very definition, the contract requires ***both*** parties to comply with the terms and conditions of the contract. Kenney Orthopedics, Inc. has continuously complied with its obligations as set forth therein and will continue to do so. I note, however, that the VA has continuously refused to abide by its obligations as set forth therein, and has repeatedly failed to provide the documentation and "evidence" that it claims supports the current witch-hunt involving Kenney Orthopedics.

To use your own language, "[t]o substantiate our concerns, several letters have been sent to [the VA] previously notifying you that [Kenney Orthopedics] considers your failure

to comply with the [terms and conditions of the parties' agreement,] a condition that is endangering performance of the contract and ***will not*** be tolerated." Unfortunately, instead of actually responding to the detailed concerns raised by Kenney Orthopedics, Inc. in each of these prior letters, you have continued to engage in further violation of the parties' agreement and you intentionally interfere with Kenney Orthopedics' ability to perform under the terms and conditions of the parties' agreement.

It is also extremely troublesome that you continue to forward the baseless threats to Kenney Orthopedics, Inc., when you have been expressly advised that this firm serves as legal counsel for Kenney Orthopedics, and is handling the within dispute. Accordingly, please assure that all future communications regarding this matter are properly forwarded to my attention at the address and telephone number listed above.

Our Veterans deserve appropriate, prompt, and proper care and treatment under the VA's guidance. When the VA engages in the unfounded and imprudent conduct which you have done in this case, it undermines the Veterans' confidence in the ability of the VA to provide proper medical treatment to Veterans. The fact that the VA makes unsupported disparaging comments, ignores unequivocal documentation that proves that those comments are false, and attacks a treatment provider that has continued – despite the VA's disparagement – to provide excellent care and treatment to these deserving Veterans, demonstrates the VA's real lack of concern over the treatment of Veterans.

Again, as we have explained on numerous occasions, given the extremely serious nature of the ongoing allegations, an immediate response from an independent party is demanded, along with any and all documentation that the VA believes supports the serious claims that you threw out in your August 29, 2007 correspondence and regurgitated, once again, in your September 18, 2007 correspondence. We will look for the VA's response to this matter on or before ***October 2, 2007***.

Sincerely,

James M. Morris

JMM:be
cc: Mr. John M. Kenney

M:\LTR\Kenney.VA10.wpd

FILE COPY

MORRIS & MORRIS, P.S.C.
ATTORNEYS AT LAW
217 NORTH UPPER STREET
P.O. BOX 394
LEXINGTON, KENTUCKY 40588-0394

SHARON K. MORRIS
JAMES M. MORRIS*
*Also Admitted in Ohio

TELEPHONE: (859) 281-6981
FACSIMILE: (859) 233-7876

October 4, 2007

SENT VIA FACSIMILE AND U.S. MAIL

Ms. Yvette Harvey, Contracting Officer
Department of Veterans Affairs
Acquisition Service Center VISN 9
3400 Lebanon Road
Murfreesboro, TN 37129

PLAINTIFF'S EXHIBIT
V

Re: Kenney Orthopedics, Inc.; Contract No. V249-P-0011

Dear Ms. Harvey:

I note that the attached correspondence from the Department of Veterans Affairs addresses some of the many substantial concerns that Kenney Orthopedics has been repeatedly voicing – especially as it pertains to the VA's improper efforts to interfere with the proper course of treatment with VA patients. Hopefully, the local VA will undertake appropriate measures, in the future, to verify whether policies being implemented are, in fact, in the best interest of the patients, as has been requested by Kenney Orthopedics.

Meanwhile, we have been attempting, for over ***six months*** to obtain information pertaining to the VA's improper, unethical, and derogatory comments pertaining to Kenney Orthopedics. As you are well aware, the VA patient in question has flatly refuted the VA's allegations, and has pointed out the fact that the VA's actions have been intentionally interfering with his ongoing treatment. The latest requested deadline of October 2, 2007

passed, again, with the VA taking absolutely no action to attempt to address its ongoing misstatements, falsehoods, inappropriate actions, and the VA's violation of the parties' agreement (including those areas addressed by the attached letter). The VA's disparaging comments and attacks are a serious issue that mandate immediate response and appropriate action. Your continued failure to address the fact that the baseless allegations regarding Kenney Orthopedics have been fully refuted by the very patient that you allege was treated negligently, and failure to address issues such as those addressed in the attached correspondence, is presenting serious concerns for the proper treatment of VA patients under your care and supervision. By copy of this letter, and all other correspondence sent by Kenney Orthopedics to you and your supervisor attempting to rectify the VA's ongoing misconduct, to Frederick Downs, Jr., Chief Prosthetics and Clinical Logistics Officer for the Department of Veterans Affairs, it is our hope and belief that the local VA's actions will be duly investigated and that appropriate action will be taken where necessary in order to assure that this type of activity does not continue to take place.

Sincerely,

James M. Morris

JMM:be

cc: Frederick Downs, Jr., Chief Prosthetics and Clinical Logistics Officer
Mr. John M. Kenney

M:\LTR\Kenney.VA11.wpd

**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Health Administration**
**Washington DC 20420**

September 21, 2007

In Reply Refer To:

Mr. Thomas Fise
AOPA Executive Director
330 John Carlyle Street
Suite 200
Alexandria, VA 22314

Dear Mr. Fise:

I am writing in reply to the concerns of the American Orthotic and Prosthetic Association (AOPA) suppliers and patient care facility members regarding Department of Veterans Affairs (VA) purchasing new and emerging high-tech componentry and having these delivered to patient care facilities, which are expected to finish fabrication, fitting and patient treatment. VA also realizes that this approach may negate manufacturer warranties and may impact malpractice coverage.

I have spoken to Robert Baum and John Milani, of my office, who attended the AOPA/VA luncheon to discuss this matter and other issues. As they have informed you, Mr. Milani, CPO, Prosthetist/Orthotist Clinical Manager, has communicated with all Prosthetic staff within VA to immediately refrain from this practice. We will continue to depend on the quality care and services we have been receiving from our local contract providers for the fabrication of the entire limb according to the local contract. I also understand you will be working with my staff to ensure consistency in billing procedures across the industry. I look forward to continuing our collaboration on this front.

I would also like to express my appreciation for our continued relationship as it serves as an example of how we can work together to ensure quality and efficient care is provided to our Nations' Veterans.

Feel free to contact Mr. Milani at 212-561-2949 or Mr. Baum at (202) 254-0440, should you have any other questions or continue to experience difficulties with regards to this matter.

Sincerely yours

For Frederick Downs, Jr.
Chief Prosthetics and Clinical Logistics Officer

# PRESCRIPTION POLICY FOR PROSTHESIS
February 28, 2007

In April 2006, each contract vendor was provided with a detailed process from VA in regards to prescribing and delivering prosthesis to our veterans.

To date, this process is not being followed in some instances. This follow up letter is to reiterate the process that must be followed to ensure our veterans are receiving the prescribed prosthesis and appropriate check out & acceptance by the VA.

The modification to the process must be followed effective immediately by all contract vendors working with our veterans.

- All temporary prosthesis will be provided by the VA.
- VA has the option to purchase prescribed components/etc for vendors use.
- Definitive prosthesis fabrication process should not begin until the VA has written the prescription for the prosthesis; the Request for Quote has been received and reviewed by the VA O&P Lab; the Purchase Order is provided to the contracted O&P vendor. The PO must not be billed until the Prosthesis is checked out in the Amputee Clinic at VA.
- Both the temporary and definitive prosthesis MUST be delivered to the veteran in the Amputee Clinic at the VA. If you are providing the definitive prosthesis, you will need to contact VA and schedule appt for the veteran in the Amputee Clinic. No prosthesis will be delivered to the veteran without being seen in Amputee Clinic at which time the prescription and prosthesis will be reviewed to ensure compliance with the prescription and that the prosthesis has a proper fit to the veteran. After the VA has approved the fabrication and fit of the prosthesis the PO may be billed.
- If the prescription requests a cover for the prosthesis, a cover will not be paid for or provided until after the prosthesis has been checked out in the Amputee Clinic.
- If any questions regarding the prescription or HCPCS codes, these questions must be brought to the attention of the VA Prosthetist.
- Contract and prescription MUST be followed.

- This same process of prescription review/approval is in effect for braces, shoes, inserts, etc as well as prosthesis. Veteran must have delivery and check out of all devices (braces, shoes, inserts, etc) in the Amputee Clinic. Veteran must bring all devices, For example, if a Veteran is prescribed 2 pair of inserts, he/she is to bring both pair for check out in clinic.

Peggy D. Allawat
Prosthetic Manager
(859)281-4871

LaVonne Money
Certified Prosthetist
(859)281-3923

DEPARTMENT OF VETERANS AFFAIRS
ACQUISITION SERVICE CENTER VISN 9
3400 LEBANON ROAD
MURFREESBORO, TN 37129

October 23, 2007

Kenney Orthopedics, Inc.
449 Lewis Hargett Circle
Suite 110
Lexington, KY 40503

Dear Mr. Kenney:

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

1. You are hereby informed that contract number VA249-P-0011 for providing Artificial Limbs to the VA Medical Center, Lexington, KY is hereby terminated for cause in its entirety. This action is taken in accordance with Federal Acquisition Regulation (FAR) 52.212-4(m) which is contained in your contract effective immediately upon receipt of this letter.

2. Kenney Orthopedics, Inc. has not responded to the cure notice issued on August 29, 2007 and to the follow up notice issued on September 18, 2007 which required a response to the Contracting Officer on October 2, 2007.

3. This termination results from your continual failure to observe the requirements of your contract, specifically to obtain a purchase order authorizing you to proceed with the required services. The VA cannot allow a contractor to continue to ignore the procedures set in place for the safety and well being of its patients.

4. Upon receipt of this notification you are to cease all services on behalf of VA patients and accept no further purchase orders because you will no longer be reimbursed under this contract.

6. This is the final decision of the Contracting Officer. You may appeal this decision to the Civilian Board of Contract Appeals (CBCA). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Civilian Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision and identify the contract by number. With regard to appeals to the Civilian Board of Contract Appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $100,000 or less. Instead of appealing to the Civilian Board of Contract Appeals, you may bring an action directly in the United States court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 601-613, regarding Maritime Contracts) within 12 months of the date you receive this decision. The Civilian Board of Contract Appeals (CBCA) is the authorized representative of the Secretary for hearing and determining such disputes. The rules of the CBCA are published at www.cbca.gsa.gov. The address of the Board is 1800 F Street, N.W., Washington, DC 20405.

Yvette Harvey
YVETTE HARVEY
Contracting Officer

PLAINTIFF'S
EXHIBIT
W